UNITED STATES v. PRESIDENT, ETC., OF JAMAICA & R. TURNPIKE CO. et al.

(Circuit Court of Appeals, Second Circuit. April 14, 1913.)

No. 5.

1. DEDICATION (§ 44*)—CANALS—PUBLIC THOROUGHFARE.

Evidence *held* insufficient to sustain a finding that a canal cut through private land to shorten a navigable river route, and maintained at private cost, was dedicated to the public as a water thoroughfare.

[Ed. Note.—For other cases, see Dedication, Cent. Dig. §§ 85–87; Dec. Dig. § 44.*]

2. NAVIGABLE WATERS (§ 20*)—OBSTRUCTIONS—BRIDGES.

A corporation organized in 1859 dug a canal over private property to shorten a navigable river route. The canal company failed in 1869, and its property and franchises were purchased by H. In 1888 or 1889 he decided to close the canal, which he did by making a solid embankment across it at a point where a turnpike had previously crossed on a bridge. Thereafter the canal could only be used for about 500 feet to the embankment, which continued for 10 years, until part of the embankment was washed away and a new bridge constructed, after which small boats passed through; but the presence of piles obstructed the passage of larger ones. *Held* that, the canal never having been dedicated to the public, the owner was entitled to close it at his election, and the government was therefore not entitled to the removal of the bridge as an obstruction to navigation, under Act Sept. 19, 1890, c. 907, 26 Stat. 453, as amended by Act July 13, 1892, c. 158, 27 Stat. 88, Act March

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

3, 1899, c. 425, § 9, 30 Stat. 1151 (U. S. Comp. St. 1901, p. 3540), and Act Feb. 20, 1900, c. 23, 31 Stat. 31 (U. S. Comp. St. 1901, p. 3542).

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 73–99; Dec. Dig. § 20.*]

This cause comes here upon appeal from a decree of the District Court, Eastern District of New York, which found that a bridge along the property of the Turnpike Company was an obstruction to the navigable capacity of the water flowing through the cut over which it was built and ordered its removal. The opinion of the District Judge will be found in 183 Fed. 598.

Wm. E. Stewart, of Long Island City, N. Y., and James L. Quackenbush, of New York City (A. C. Peacock, of New York City, of counsel), for appellants.

Wm. J. Youngs, U. S. Atty., of Brooklyn (L. R. Bick, Asst. U. S. Atty., of Brooklyn, N. Y., of counsel), for the United States.

Before LACOMBE, COXE, and NOYES, Circuit Judges.

LACOMBE, Circuit Judge. Hook creek is a tidal stream emptying into an arm of Jamaica Bay, shallow at low water, having sometimes as little as 2 feet or so, with a rise and fall of tide of from 4 to 5 feet. From its outlet it bears off to the south and west in a winding course, turning after a bit to the eastward until it reaches a point about north of its outlet and some 500 or 600 feet therefrom. From this point it turns north for about 2 miles to a place which used to be called Foster's Meadow and is now a settlement known as Rosedale. At this place there was and is a dock known as Hirst's Dock, or the Canal Dock. The length of this irregular bow, formed by the course to the south and west and return, is about a mile and a half. This was the natural condition of the stream so far back as the testimony discloses it. The turnpike from Jamaica to Far Rockaway ran close to the creek, where it turns to the north, and further on crossed it in the southerly part of the bow.

[1] By special act of the Legislature the Foster's Meadow Canal & Dock Company was incorporated in 1859. It dug a canal, over private property from the outlet to the place where the creek turned north, having obtained the consent of the Turnpike Company to cut through its road, upon condition that it would build a bridge. This it did, the bridge having some sort of draw which could be unlocked, opened, and relocked by a person passing in a boat, who had been furnished with a key. This artificial waterway reduced the distance from the dock to the outlet nearly a mile and a half, and boats, which before had gone through the bow of the creek, went through the canal. The Canal Company failed in 1867, and all its property and franchises were purchased by one John Hirst. From the time the canal was opened, until 1888 or 1889, pleasure craft, rowboats, and sailboats, and small scows carrying fertilizer, bricks, coal, and hay, and fishing craft of various sizes, passed to and from the upper waters of the creek through the canal to its outlet. During all this period the Canal Company and its successor appear to have demanded and received toll

from boats using their improvements. There were many occasions, no doubt, when toll was not collected. The situation was such, and the extent of navigation so trivial, that it would not pay to maintain a toll gatherer permanently at the entrance to the canal. The owner had to depend for his collections upon his own actual presence when his canal was used. The testimony in our opinion wholly fails to support the conclusion contended for that this canal, cut through private land and maintained at private cost, was ever dedicated to the public as a water thoroughfare.

[2] About 1888 or 1889, for some reason not explained, Hirst, then the owner, decided to close the canal. His predecessor's contract with the Turnpike Company obligated him to erect, and presumably maintain, any bridge that might be necessary to permit the crossing of the turnpike by the canal. Such maintenance might involve expense. He therefore undertook to restore the turnpike to its original condition, filling the canal in at the crossing, and making a solid embankment to carry the roadway. Thereafter the only waterway from the outlet to the dock or landing places at Foster's Meadow or Rosedale was through the natural channel of the stream, around the westerly bend or bow, and then north. The canal could still be entered from the outlet; but, as it only ran about 500 feet to the turnpike embankment, it was little used and only by pleasure craft. This condition of things continued about 10 years. In the meantime the Long Island Electric Railway, with consent of the Turnpike Company, had laid and operated a trolley line from Jamaica to Far Rockaway. It was found that during the spring and autumn there was a difference in tide level between the bay side and the creek side of the turnpike, so that, on occasions when a strong wind combined with an exceptionally high tide, water flowed over the roadway, washing it away, and making the track unsafe. To remedy this the filling at the place of intersection, except some piles driven in the bed of the old canal, was removed, and the bridge now complained of was built. Since then small rowboats and sailboats with removable masts have gone through; but the piles prevent the passage of the loaded scows or lighters, such as used to pass. It is difficult and risky for a motor boat to go through, although some have done so.

The present application is for the removal of the bridge under the provisions of Act Sept. 19, 1890, c. 907, 26 Stat. 453, as amended by Act July 13, 1892, c. 158, 27 Stat. 88, Act March 3, 1899, c. 425, § 9, 30 Stat. 1151 (U. S. Comp. St. 1901, p. 3540), and Act Feb. 20, 1900, c. 23, 31 Stat. 31 (U. S. Comp. St. 1901, p. 3542). It is contended that its construction obstructs or impairs navigation or commercial use of navigable waters of the United States. That statute has been fully construed in Leovy v. U. S., 177 U. S. 621, 20 Sup. Ct. 797, 44 L. Ed. 914, and cases therein cited. Certainly the condition of affairs existing for 10 years before the present bridge was built does not present a case of any commercial use of this canal, which then ran only from the outlet to the embankment. Prior to that we have a private cut through private land, which in no way interfered with the natural course of any navigable stream, and through which such as chose to pay the owner for the privilege might pass, and thereby shorten their

journey, from one part of the stream to another. Never having dedicated his canal to the public, the owner could have filled it in and planted crops or built upon it whenever he found it unremunerative, because neither its opening nor closing interfered with the natural channel of the creek, which was at all times open, as it always had been.

The decree is reversed, with costs.