578 F.2d 742
 11 ERC 1729, 8 Envtl. L. Rep. 20,480
 LESLIE SALT CO. et al., Appellants-Cross-Appellees,
v.
Robert F. FROEHLKE, Secretary of the Army, et al.,
Appellees-Cross-Appellants,
and
Sierra Club et al., Appellees-Cross-Appellants.
SIERRA CLUB et al., Appellees-Cross-Appellants,
v.
LESLIE SALT CO. et al., Appellants-Cross-Appellees.
 Nos. 76-2414, 76-3135, 76-3202 and 76-2696.
 United States Court of Appeals,
Ninth Circuit.
 May 11, 1978.
As Amended June 9, 1978.
Rehearing and Rehearing En Banc Denied July 19, 1978.
 
 Edgar B. Washburn (argued), of Landels, Ripley & Diamond, San Francisco, Cal., for appellants-cross-appellees.
 Kathryn Oberly (argued), Anthony C. Liotta, Acting Dep. Asst. Atty. Gen., Raymond N. Zagone, Washington, D.C., James L. Browning, Jr., U.S. Atty., David E. Golay, Asst. U.S. Atty., San Francisco, Cal., for Appellees-cross-appellants Froehlke et al.
 Appeal From the United States District Court for the Northern District of California.
 Before MERRILL, CUMMINGS,* and SNEED, Circuit Judges.
 SNEED, Circuit Judge:
 
 
 1
 These appeals deal with the scope of the regulatory jurisdiction of the U.S. Army Corps of Engineers ("Corps") over "navigable waters of the United States" as that term is used, first, in the Rivers and Harbors Act of 1899, 33 U.S.C. § 401 et seq., and, second, in the Federal Water Pollution Control Act of 1972, 33 U.S.C. § 1251, et seq.
 
 
 2
 Suit was initiated on March 29, 1972, by the Sierra Club against Leslie Salt Co. ("Leslie"), seeking a declaratory judgment that Leslie's diked evaporation ponds in and around Bair Island in San Francisco Bay were built in violation of the Rivers and Harbors Act of 1899 because Leslie had failed to seek or obtain permits from the Corps. The action also sought a permanent injunction ordering removal of the dikes or, in the alternative, prohibiting further construction or maintenance of dikes at Bair Island. Leslie then sued the Corps on December 20, 1973, seeking a declaration that the regulatory jurisdiction of the Corps over tidal marshlands in San Francisco Bay under both the Rivers and Harbors Act of 1899 and the Federal Water Pollution Control Act of 1972 ("FWPCA") is delimited by the line of mean high water ("MHW"). The Sierra Club was permitted to intervene in this action.
 
 
 3
 The two cases were consolidated for trial. On December 9, 1974, the district court rendered partial summary judgment in favor of the Corps and the Sierra Club in Leslie's suit against the Corps ("Leslie's suit"), holding that the Corps's jurisdiction under the FWPCA extends to the line of mean higher high water ("MHHW") on the Pacific coast. Leslie Salt v. Froehlke, 403 F.Supp. 1292 (N.D.Cal.1974). This was followed on March 11, 1976 by an opinion in both cases holding that the Corps's jurisdiction under the Rivers and Harbors Act also extends to the MHHW line on the Pacific coast. Sierra Club v. Leslie Salt, 412 F.Supp. 1096, 1102 (N.D.Cal.1976). The district court further held that the Corps's jurisdiction extends to the former MHHW line in its unobstructed, natural state, rather than to the present MHHW line, which at least in part follows the bayward edge of Leslie's dikes. Id. at 1102. Finally, the court held that although the Corps had timely asserted its jurisdiction over the discharge of dredged or fill material under the FWPCA of 1972, it was estopped from requiring permits under the Rivers and Harbors Act for the future maintenance of any obstruction already constructed before the Corps's assertion of jurisdiction. Id. at 1104. The court ruled that its estoppel holding in Leslie's suit against the Corps was also applicable to the Sierra Club's action ("Sierra Club's suit"), which later was dismissed on the court's own motion. These appeals followed.
 
 
 4
 The district court erred in holding that the Corps's jurisdiction under the Rivers and Harbors Act extends to the MHHW line on the Pacific coast, but was correct insofar as its holding subjected to the Corps's jurisdiction under the FWPCA waters which are no longer subject to tidal inundation because of Leslie's dikes, without regard to the location of historic tidal water lines in their unobstructed, natural state. The district court also erred in dismissing Sierra Club's suit against Leslie, designated in this court as No. 76-2696. Therefore, we reverse in part, modify in part, and remand No. 76-2696 for further proceedings.
 
 I.
 
 5
 Facts.
 
 
 6
 Leslie owns some 35,000 acres of property along the shores of south San Francisco Bay. Appellant Mobil Oil Estates Ltd. (Bair Island Investments) is the owner of a 3,000-acre parcel in San Mateo County known as "Bair Island."[1] The subject lands were originally conveyed by the United States to the State of California pursuant to the Arkansas Swamp Act of 1850, 43 U.S.C. § 981 et seq., and then patented by the state to Leslie's predecessors in interest. In its natural condition, the property was marshland subject to the ebb and flow of the tide.[2] Commencing in 1860, the land was diked and reclaimed and has since that time been used primarily for salt production by means of solar evaporation of Bay waters introduced into Leslie's salt ponds. These dikes were completed, for the most part, in 1927, although some work continued through 1969. Because of these dikes, the land in question has not been subject to tidal action on a regular basis, although most of it is periodically inundated by Bay waters for salt production. The Bair Island property was removed from salt production in 1965; because of the continued maintenance of dikes on the island, it has become dry land.
 
 
 7
 In 1971 and 1972, the San Francisco District of the Corps published two Public Notices (No. 71-22 on June 11, 1971, and No. 71-22(a) on January 18, 1972), stating that the Corps had changed its policy and would henceforth require permits for all "new work" on unfilled marshland property within the line of "former mean higher high water," whether or not the property was presently diked off from the ebb and flow of the tides.[3]
 
 
 8
 In these Public Notices the Corps purported simply to redefine the scope of its regulatory authority within the ambit of the Rivers and Harbors Act of 1899, sections 9 and 10 of which prohibit filling or the construction of any "dam," "dike," "obstruction," or "other structures" within the "navigable water of the United States," without the prior authorization of the Corps of Engineers. 33 U.S.C. §§ 401, 403.[4]
 
 
 9
 An understanding of the technical tide line terminology is critical to this case. Every 24.8 hours, both the Pacific and Atlantic coasts of the United States experience two complete tidal cycles, each including a high and a low tide. The Gulf coast tides, known as diurnal, have but one high and one low tide each lunar day. On the Atlantic coast, the difference between the two daily tidal cycles, known as semi-diurnal tides, is relatively slight. Accordingly, there is in most instances little difference between the two high tides or between the two low tides in a given day on the east coast. The two daily Pacific coast tidal cycles (known as "mixed type" tides), however, in most locations are substantially unequal in size, with one high tide significantly higher than the other. The mean high water line is the average of both of the daily high tides over a period of 18.6 years; the mean higher high water line is the average of only the higher of the two tides for the same period of time. Thus, on the Atlantic coast the difference between the MHW and the MHHW is relatively small, while on the Pacific coast generally it is relatively large. Sierra Club v. Leslie Salt, supra, 412 F.Supp. at 1098-99.
 
 
 10
 We shall first discuss Leslie's suit and then turn to that of the Sierra Club.
 
 II.
 
 11
 Leslie's Suit.
 
 
 12
 A. Summary Judgment in Leslie's Suit.
 
 
 13
 A threshold question is raised by Leslie as to whether summary judgment was improperly granted. We find that the district court did not err in deciding that there were no genuine issues of material fact. The issues to be decided in Leslie's suit were purely legal. As framed by Leslie, the action was for a declaratory judgment that the regulatory jurisdiction of the Corps under both the Rivers and Harbors Act and the FWPCA extended only to the MHW line, and an injunction restraining the Corps from requiring permits for properties located above the MHW line. The suit did not involve action or inaction by the Corps on any particular application by Leslie for a permit under the Rivers and Harbors Act or the FWPCA, since Leslie has refused to apply for any permits. Thus, the particular circumstances and characteristics of Leslie's property in this case were not material to the questions raised on the motions for summary judgment.
 
 
 14
 B. Scope of Corps's Jurisdiction Under Rivers and Harbors Act.
 
 
 15
 Analysis of the Rivers and Harbors Act must begin by acknowledging that it does not define the terms "navigable water of the United States" or "waters of the United States." Pertinent regulations defining these terms have recently been adopted by the Corps. On July 25, 1975, after the San Francisco District of the Corps issued the two Public Notices dealing with the use of the MHHW line as the limit of its jurisdiction, the Corps promulgated the following definition of "navigable waters of the United States":
 
 
 16
 The term, "navigable waters of the United States," is administratively defined to mean waters that have been used in the past, are now used, or are susceptible to use as a means to transport interstate commerce landward to their ordinary high water mark and up to the head of navigation as determined by the Chief of Engineers, and also waters that are subject to the ebb and flow of the tides shoreward to their mean high water mark (mean higher high water mark on the Pacific coast ). See 33 C.F.R. 209.260 (ER 1165-2-302) for a more definitive explanation of this term.
 
 
 17
 33 C.F.R. § 209.120(d)(1) (emphasis added).[5]
 
 
 18
 Regulation 209.260, adopted September 9, 1972, provides in most pertinent part, as follows:
 
 
 19
 Shoreward limit of jurisdiction. Regulatory jurisdiction in coastal areas extends to the line on the shore reached by the plane of the mean (average) high water. However, on the Pacific coast, the line reached by the mean of the higher high waters is used.
 
 
 20
 33 C.F.R. § 209.260(k)(1)(ii) (emphasis added).[6]
 
 
 21
 Prior to these amendments the Regulation did not address itself to the shoreward limit of its jurisdiction and deferentially set forth its views regarding what constitutes navigable water as merely "the views of the Department since the jurisdiction of the United States can be conclusively determined only through judicial proceedings." 33 C.F.R. § 209.260(a) (1971).
 
 
 22
 Leslie contends that the district court's ruling upholding the Corps's regulations is contrary to every reported decision defining the boundaries of tidal water bodies. Conceding that Congress may in theory have the power under the Commerce Clause to legislate with respect to land between the MHW and the MHHW line, Leslie argues that the "navigable waters of the United States" within the meaning of the Rivers and Harbors Act have consistently been judicially extended only to the MHW line. In response, the Corps and the Sierra Club argue that the extent of Rivers and Harbors Act jurisdiction on the Pacific coast is an issue of first impression for any appellate court, and has arisen in only two previous court cases.[7] They urge that the Corps's use of the MHHW line on the Pacific coast is a logical and reasonable attempt to "harmonize" its regulatory program throughout the country. Inasmuch as Leslie accurately describes the state of the authorities, the Corps and Sierra Club in effect invite us to read the Act differently than in the past to accommodate the desire of the Corps to extend its jurisdiction on the Pacific coast. We decline the invitation because we believe it is misdirected. It should be addressed to Congress rather than the Judiciary.
 
 
 23
 Turning to the authorities, the Supreme Court in 1915 held that federal regulatory jurisdiction over navigable tidal waters extends to the MHW line. Willink v. United States, 240 U.S. 572, 580, 36 S.Ct. 422, 60 L.Ed. 808 (1916). While Willink was concerned with the boundaries of the tidal waters on the Atlantic coast, the case is significant because it deals directly with the relationship between the federal navigational servitude and the Corps's regulation of "navigable waters of the United States." The servitude, which reaches to the limits of "navigable water," permits the removal of an obstruction to navigable capacity without compensation. See 33 U.S.C. § 403. Accordingly, an expansion of "navigable water" shoreward diminishes the protection of the Fifth Amendment. We think an interpretation of the Act which accomplishes this, first advanced seventy-two years after its enactment, should be viewed with skepticism to say the least.
 
 
 24
 The district court in support of its interpretation relied on the earlier river case of Greenleaf-Johnson Lumber Co. v. Garrison, 237 U.S. 251, 35 S.Ct. 551, 59 L.Ed. 939 (1915), to derive the "underlying principle" that federal authority over navigable waters "necessarily . . . extends to the whole expanse of the stream, and is not dependent upon the depth or shallowness of the water." Greenleaf-Johnson, 237 U.S. at 263, 35 S.Ct. at 555. The trouble with this "principle," however, is that it could support the use of the extreme high spring tides for the line of jurisdiction just as well as it supports MHW or MHHW. A "principle" which bestows more power than its beneficiary currently requests should not be readily accepted.
 
 
 25
 Consistent with Willink, however, is the leading case defining the extent of tidal water bodies on the Pacific coast. Borax Consolidated, Ltd. v. City of Los Angeles, 296 U.S. 10, 56 S.Ct. 23, 80 L.Ed. 9 (1935) originated in a property dispute brought by Los Angeles to quiet title to land on an island in Los Angeles harbor. At issue was the proper boundary between tidelands as to which the State possessed original title upon admittance to the Union, and uplands, which became public lands of the United States at the time of their acquisition from Mexico. Los Angeles claimed the disputed property under a tidelands grant from the State of California, while Borax Consolidated, the upland owner, claimed under a patent issued by the United States. The specific question presented on appeal to the Supreme Court was whether this boundary line was the mean high tide line as urged by Los Angeles, or the "neap tide" line, as Borax Consolidated contended. Neap tides are those which occur monthly when the moon is in its first and third quarters, during which time the tide does not rise as high or fall as low as on the average. In contrast, "spring tides," which occur at times of new moon and full moon, are greater than average. During spring tide the high water rises higher and low water falls lower than usual. Borax, supra, 296 U.S. at 23, 56 S.Ct. 23.
 
 
 26
 The Supreme Court, affirming a decision of this court, held that the tideland extends to the MHW mark as technically defined by the United States Coast and Geodetic Survey: that is, "the average height of all the high waters" at a given place over a period of 18.6 years. Id. at 26-27, 56 S.Ct. at 31 (emphasis added). The Supreme Court stated its rationale as follows:
 
 
 27
 (B)y the common law, the shore "is confined to the flux and reflux of the sea at ordinary tides." . . . It is the land "between ordinary high and low water mark, the land over which the daily tides ebb and flow. . . ."
 
 
 28
 The range of the tide at any given place varies from day to day, and the question is: How is the line of "ordinary" high water to be determined? . . .
 
 
 29
 In determining the limit of the federal grant, we perceive no justification for taking neap high tides, or the mean of those tides, as the boundary between upland and tideland, and for thus excluding from the shore the land which is actually covered by the tides most of the time. In order to include the land that is thus covered, it is necessary to take the mean high-tide line, which . . . is neither the spring tide nor the neap tide, but a mean of all the high tides.
 
 
 30
 Id. at 22-23, 26, 56 S.Ct. at 29, 31.
 
 
 31
 The district court below distinguishes Borax on the grounds that the Supreme Court was dealing with an issue of title and "made no reference to the federal navigational servitude under the Rivers and Harbors Act or to the distinction of MHHW and MHW." Sierra Club v. Leslie Salt Co., supra, 412 F.Supp. at 1101. However, Borax cannot be brushed aside so easily. The considerations involved in the regulation of navigable waters under the commerce power are intimately connected to the question of title to tidelands. The term "navigable waters" has been judicially defined to cover: (1) nontidal waters which were navigable in the past or which could be made navigable in fact by "reasonable improvements," United States v. Appalachian Electric Power Co., 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243 (1940); Economy Light & Power Co. v. United States, 256 U.S. 113, 41 S.Ct. 409, 65 L.Ed. 847 (1921); and (2) waters within the ebb and flow of the tide. The Propeller Genesee Chief v. Fitzhugh, 53 U.S. (12 How.) 443, 13 L.Ed. 1058 (1851); United States v. Stoeco Homes, Inc., 498 F.2d 597 (3d Cir. 1974), cert. denied, 420 U.S. 927, 95 S.Ct. 1124, 43 L.Ed.2d 397 (1975); United States v. President, etc., of Jamaica & R.T.R., 183 F. 598, 601 (C.C.E.D.N.Y.1910), rev'd on other grounds, 204 F. 759 (2d Cir. 1913); United States v. Banister Realty Co.,155 F. 583, 594 (C.C.E.D.N.Y.1907). Tideland, by definition, is the soil underlying tidal waters. To fix the shoreward boundary of tideland there must be fixed the shoreward limit of tidal water which, in turn, should fix the shoreward limit of "navigable waters" in the absence of a contrary intent on the part of Congress. To fix the limit of "navigable water," for the purposes of the Rivers and Harbors Act, further shoreward than Borax fixed the limit of "tidal water" assumes the existence of an intent of Congress at the time of the Act's enactment of which we have no evidence.
 
 
 32
 The high probability that Congress in the Act intended that the shoreward limit of tidal water and navigable water be the same is supported by the fact that only five years previously in Shively v. Bowlby, 152 U.S. 1, 14 S.Ct. 548, 38 L.Ed. 331 (1894), the Supreme Court held that a "donation land claim, bounded by the Columbia river, . . . includes no title or right in the land below high-water mark," id. at 58, 14 S.Ct. at 570, resting its conclusion on the fact that lands under "tide waters" had "great value to the public for the purposes of commerce, navigation, and fishery." Id. at 57, 14 S.Ct. at 569. Shively, we suggest, assumed that the shoreward limit of the navigational servitude, and thus also the shoreward limit of navigable water, fixed the seaward limit of private ownership. Numerous other cases have recognized that land ownership can be determined by the limits of navigable water. See, 1 R. E. Clark, Waters and Water Rights § 37.2(c) (1967).
 
 
 33
 This long-standing recognition that, for the purpose of fixing a shoreward limit, the terms tide water and navigable water are interchangeable strongly suggests that in Borax the Supreme Court, in the course of settling a title dispute, also fixed the shoreward boundary of navigable water on the Pacific coast. This is buttressed by the fact that since Borax and Willink, the MHW line has been routinely cited as the boundary of federal regulatory jurisdiction over tidal waters by every court to consider the question, with the two recent exceptions upon which the Corps and Sierra Club rely. United States v. Stoeco Homes, Inc., supra, 498 F.2d 597 (3d Cir. 1974), cert. denied, 420 U.S. 927, 95 S.Ct. 1124, 43 L.Ed.2d 397 (1975); United States v. Holland, 373 F.Supp. 665 (M.D.Fla.1974); United States v. Cannon, 363 F.Supp. 1045 (D.Del.1973); United States v. Pot-Nets, 363 F.Supp. 812 (D.Del.1973); United States v. Lewis, 355 F.Supp. 1132 (S.D.Ga.1973). As stated in Holland, supra:
 
 
 34
 Borax became a landmark case in the law of tidal boundaries. And even though the test used by the Supreme Court was enunciated to settle a land dispute, and notwithstanding the fact that the test derived from an English court's desire to preserve to property owners so much of the land as is "dry and maniorable", the test of the mean high water mark became the inveterate standard to be applied in limiting federal authority over navigable waters.
 
 
 35
 Holland, supra, 373 F.Supp. at 671.
 
 
 36
 Although these cases all arose on the Atlantic or Gulf coasts, each implicitly accepts Borax, a Pacific coast case,[8] as enunciating a rule applicable to all coasts of the United States. Taken together, they indicate the extent to which the MHW line has been consistently accepted as the boundary of "navigable waters of the United States." To affirm the Corps's recent regulations setting the shoreward reach of federal regulatory power on the Pacific coast at the MHHW line would constitute a dramatic reversal of long-established decisional precedent.[9]
 
 
 37
 The appellees insist that the Corps's recently promulgated regulations using the MHHW line are not an extension of jurisdiction, but merely a recognition of previously informal policy. They point to the testimony of various Corps officials, both in depositions taken for trial and in Congressional hearings, that the Government's policy had always been to assert Corps regulatory jurisdiction on the Pacific coast up to the MHHW; but that in marsh areas, the seaward edge of marsh grass was used to mark the limits of permit authority, even if the MHHW line was shoreward of this. This inchoate policy apparently remained unstated until 1969, when the first public reference to it was made in a Congressional hearing. House Committee on Government Operations, Protecting America's Estuaries: The San Francisco Bay and Delta, H.R.Rep. No. 1433, 91st Cong., 2d Sess., 50-51 (1970); House Committee on Government Operations, Increasing Protection For Our Waters, Wetlands, and Shorelines: The Corps of Engineers, H.R.Rep. No. 1323, 92d Cong., 2d Sess., 27-33 (1972).[10] Assuming arguendo that there was such a policy on the part of the Corps, we cannot accept an interpretation which was never stated or practiced, and which is so clearly contrary to the long-established precedent to which the Corps in its regulations prior to 1972 gave deference. Neither do we perceive how the use of MHHW on the Pacific coast and MHW elsewhere would bring any more "harmony" to the Corps's regulatory jurisdiction than has existed under the heretofore uniform application of the MHW line on all coasts.[11]
 
 
 38
 Moreover, we have already indicated that more is involved than simply an expansion of the Corps's regulatory authority. As stated by the Supreme Court in United States v. Virginia Electric Co., 365 U.S. 624, 81 S.Ct. 784, 5 L.Ed.2d 838 (1961):
 
 
 39
 This navigational servitude sometimes referred to as a "dominant servitude," . . . or a "superior navigation easement," . . . is the privilege to appropriate without compensation which attaches to the exercise of the "power of the government to control and regulate navigable waters in the interest of commerce." United States v. Commodore Park, 324 U.S. 386, 390, 65 S.Ct. 803, 89 L.Ed. 1017.
 
 
 40
 United States v. Virginia Electric, 365 U.S. at 627-28, 81 S.Ct. at 787 (emphasis added).
 
 
 41
 The navigational servitude reaches to the shoreward limit of navigable waters. To extend the servitude on the basis of a recently formulated administrative policy is to impose an additional burden of unknown magnitude on all private property that abuts on the Pacific coast.
 
 
 42
 We wish to point out, however, that our interpretation of the Rivers and Harbors Act is not governed by a belief that the Act represents the full exertion by Congress of its authority under the Commerce Clause. To paraphrase the Court of Appeals for the Third Circuit in Stoeco Homes, supra, "we can put aside the question whether under the Commerce Clause, Congress could extend the regulatory jurisdiction of the Army Corps of Engineers" to the MHHW line or beyond:
 
 
 43
 In the statute on which the government relies Congress did not do so. It extended that jurisdiction only to the navigable waters of the United States. . . .(The Rivers and Harbors Acts of 1890 and 1899) were enacted pursuant to the Commerce Clause, but neither reached the full extent of Congressional power over commerce. That power was exercised in 1890 to protect "waters, in respect of which the United States has jurisdiction" and in 1899 to protect "waters of the United States." Congress obviously adopted the judicial definition of those waters as of 1890. That definition was the admiralty definition.
 
 
 44
 Stoeco Homes, supra, 498 F.2d at 608-09 (emphasis added).
 
 
 45
 We hold that in tidal areas, "navigable waters of the United States," as used in the Rivers and Harbors Act, extend to all places covered by the ebb and flow of the tide to the mean high water (MHW) mark in its unobstructed, natural state. Accordingly, we reverse the district court's decision insofar as it found that the Corps's jurisdiction under the Rivers and Harbors Act includes all areas within the former line of MHHW in its unobstructed, natural state.
 
 
 46
 Our holding that the MHW line is to be fixed in accordance with its natural, unobstructed state is dictated by the principle recognized in Willink, supra, that one who develops areas below the MHW line does so at his peril. We recognize that under this holding issues of whether the Government's power may be surrendered or its exercise estopped, and if so, under what circumstances and to what extent, may arise. Leslie, for example, may contend that there has been a surrender by the Corps of its power under the Rivers and Harbors Act with respect to certain land below the MHW line. Such contentions, however, are not presently before us in this case. Therefore, at this time it is not necessary for us to pass on issues such as were before the court in Stoeco, supra.
 
 
 47
 C. Scope of Corps's Jurisdiction Under FWPCA.
 
 
 48
 The scope of regulatory authority under the FWPCA presents a substantially different issue. The district court's holding that the Corps's regulatory jurisdiction under the FWPCA is "coterminous" with that under the Rivers and Harbors Act, extending to "the former line of MHHW of the bay in its unobstructed, natural state," is faulty. Sierra Club v. Leslie Salt, supra, 412 F.Supp. at 1102-03. In its opening brief in this appeal, Leslie properly concedes that:
 
 
 49
 . . . the Corps' jurisdiction under Section 404 of the FWPCA is broader than its jurisdiction under the Rivers and Harbors Act in that it encompasses existing marshlands located above as well as below the lines of mean high water and mean higher high water which are currently subject to tidal inundation.
 
 
 50
 Brief for Appellant Leslie Salt Co. at 60.[12]
 
 
 51
 Leslie contends, however, that the use of the former unobstructed, natural MHHW line "extends the Corps' regulatory authority significantly further than is authorized by the FWPCA," because it results in the possibility that the Corps would be able to regulate discharges onto dry lands under an Act whose purpose is to control pollution of the nation's waters. Id.
 
 
 52
 This contention presents a false issue. Neither the Corps nor the Sierra Club argues for the result envisioned by Leslie. Instead, they contend that under the FWPCA,[13] the case law interpreting it, and the Corps's own regulations, neither the MHW nor the MHHW line marks the full limit of the Corps's jurisdiction to regulate the pollution of the waters of the United States. The appellees, however, agree with appellant Leslie that, as stated in the Sierra Club's brief,
 
 
 53
 (i)f any portions of Leslie's property were in fact dry, solid upland as of the date of the passage of the FWPCA, therefore, not subject to being returned to their former natural condition of periodic tidal inundation should the artificial obstructions be abated, that property would fall outside the Corps' Section 404 jurisdiction . . . .
 
 
 54
 Brief for Appellee Sierra Club at 84.
 
 
 55
 Where the parties differ is on the question of whether the Corps's jurisdiction covers waters which are no longer subject to tidal inundation because of man-made obstructions such as Leslie's dikes. These are the waters which the district court apparently wanted to include under the aegis of the FWPCA through the use of the historic MHHW line "in its unobstructed, natural state."
 
 
 56
 There are at least two problems with the district court's solution to the issue of Corps authority over Leslie's salt ponds. First, it goes beyond the necessities of this case. Although the appellees insist that the court did not mean to include "fast land," or "improved solid upland" within the ambit of its decision, its order is in fact ambiguous. It simply states that:
 
 
 57
 Pursuant to the FWPCA the Corps may require permits for the discharge of dredged or fill material up to the line of MHHW in its unobstructed natural state, as defined in effect in the Corps' Public Notices 71-22 and 71-22(a) . . . .
 
 
 58
 Sierra Club v. Leslie Salt Co., supra, 412 F.Supp. at 1104.
 
 
 59
 Public Notice No. 71-22(a), published on January 18, 1972, restricts the permit requirement for new work in diked areas below former MHHW to "unfilled portions" thereof.[14] The court's order, on the other hand, leaves open the possibility of an interpretation to which appellant objects and upon which appellee does not insist.
 
 
 60
 Second, and much more important, the court below actually placed undue limits on the FWPCA when it stated that "the geographical extent of the Corps' jurisdiction under the Rivers and Harbors Act is coterminous with that under FWPCA." Sierra Club v. Leslie Salt Co., supra, 412 F.Supp. at 1102. It is clear from the legislative history of the FWPCA that for the purposes of that Act, Congress intended to expand the narrow definition of the term "navigable waters," as used in the Rivers and Harbors Act.[15] This court has indicated that the term "navigable waters" within the meaning of the FWPCA is to be given the broadest possible constitutional interpretation under the Commerce Clause. California v. Environmental Protection Agency, 511 F.2d 963, 964 n.1 (9th Cir. 1975), rev'd on other grounds sub nom. Environmental Protection Agency v. State Water Resources Control Board, 426 U.S. 200, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976) ("Congress clearly meant to extend the Act's jurisdiction to the constitutional limit. . . ."). See United States v. Phelps Dodge Corp., 391 F.Supp. 1181 (D.Ariz.1975); United States v. Holland, supra, 373 F.Supp. 665 (M.D.Fla.1974). Also in Phelps Dodge, supra, the court interpreted the FWPCA broadly in finding that:
 
 
 61
 . . . a legal definition of "navigable waters" or "waters of the United States" within the scope of the (Federal Water Pollution Control) Act includes any waterway within the United States also including normally dry arroyos through which water may flow, where such water will ultimately end up in public waters such as a river or stream, tributary to a river or stream, lake, reservoir, bay, gulf, sea or ocean either within or adjacent to the United States.
 
 
 62
 Phelps Dodge, supra, 391 F.Supp. at 1187. See also, United States v. Holland, supra, 373 F.Supp. at 670-676.
 
 
 63
 The water in Leslie's salt ponds, even though not subject to tidal action, comes from the San Francisco Bay to the extent of eight to nine billion gallons a year. We see no reason to suggest that the United States may protect these waters from pollution while they are outside of Leslie's tide gates, but may no longer do so once they have passed through these gates into Leslie's ponds. Moreover, there can be no question that activities within Leslie's salt ponds affect interstate commerce, since Leslie is a major supplier of salt for industrial, agricultural, and domestic use in the western United States. Much of the salt which Leslie harvests from the Bay's waters at the rate of about one million tons annually enters interstate and foreign commerce.
 
 
 64
 Our suggestion that the full extent of the Corps's FWPCA jurisdiction over the "waters of the United States" is in some instances not limited to the MHW or the MHHW line is reinforced by regulations published by the Corps on July 19, 1977 and found at 33 C.F.R. § 323.2, as published at 42 Fed.Reg. 37144-37145.[16]
 
 
 65
 Without determining the exact limits of the scope of federal regulatory jurisdiction under the FWPCA, we find that the regulations at 33 C.F.R. § 323.2 are reasonable, consistent with the intent of Congress, and not contrary to the Constitution. We therefore hold that the Corps's jurisdiction under the FWPCA extends at least to waters which are no longer subject to tidal inundation because of Leslie's dikes without regard to the location of historic tidal water lines in their unobstructed, natural state. We express no opinion on the outer limits to which the Corps's jurisdiction under the FWPCA might extend.
 
 
 66
 Our holdings with respect to the Rivers and Harbors Act of 1899 and the FWPCA dispose of the declaratory judgment sought by Leslie in its case. Any claims by Leslie, which may be engendered by these holdings, and which are not also involved in Sierra Club's case, whether based on equitable considerations, estoppel, or surrender, must be made and considered in a separate and independent proceeding.
 
 III.
 
 67
 Sierra Club's Suit.
 
 
 68
 The district court applied its ruling in Leslie's case against the Corps to the Sierra Club's suit as well. In an order filed June 30, 1976, the court ruled that "there are no issues remaining to be tried in action No. C-72-561 WTS," and dismissed the Sierra Club's complaint in that case. On appeal, the Sierra Club has contended that genuine issues of material fact remain to be tried in the Bair Island case which preclude summary dismissal of its complaint in that action. In oral argument before this Court, Leslie conceded that the Sierra Club's action does involve unresolved issues not properly determined on summary judgment. We agree, and therefore remand case No. 76-2696 for trial.
 
 
 69
 In doing so we point out that our holding with respect to the limit of the Corps's authority under the Rivers and Harbors Act is applicable to Sierra Club's suit. We also recognize that our precise holding with respect to the Corps's power under the FWPCA may not be sufficiently comprehensive to dispose of all questions that might arise on remand. Our reluctance to address issues, which on the basis of the present record must be hypothetical, is required by our disability to render advisory opinions. A full development of the facts on remand will remove this obstacle.
 
 
 70
 The decision of the district court with respect to the Rivers and Harbors Act of 1899 is reversed. The decision of the district court with respect to the FWPCA is reversed in part and modified in part. The action of the Sierra Club against Leslie Salt is remanded for further proceedings not inconsistent with this opinion.
 
 
 71
 Reversed in part, Modified in part, and Remanded in part.
 
 
 
 *
 Hon. Walter J. Cummings, United States Circuit Judge, for the Seventh Circuit Court of Appeals, sitting by designation
 
 
 [1]
 Leslie, which conveyed this property to Mobil Oil Estates, has represented the interests of the latter throughout this suit. Accordingly, reference will be made only to Leslie herein
 
 
 [2]
 In its brief, Leslie asserts that "(i)n their natural condition the former marshlands in question were located above the line of mean high water . . . ." This statement is disputed by the Sierra Club, particularly with respect to Bair Island; apparently it is not disputed by the United States, however
 
 
 [3]
 Public Notice No. 71-22 provides in pertinent part as follows:
 This Public Notice is issued to inform all interested parties of the definition of navigable waters of the United States subject to tides in which the permit procedures established by the River & Harbor Act of 1899 are applicable. Henceforth limits of jurisdiction over such waters shall extend to the line on shore reached by the plane of the mean of the higher high water.
 Public Notice No. 71-22(a) provides as follows:
 This is in elaboration of our previous Public Notice No. 71-22, dated 11 June 1971, announcing that the Corps of Engineers is now exercising its regulatory authorities within the area bound by the plane of the mean of the higher high water. Permits are required for all new work in unfilled portions of the interior of diked areas below former mean higher high water.
 
 
 [4]
 Section 9 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 401, provides in pertinent part as follows:
 It shall not be lawful to construct . . . any bridge, dam, dike or causeway over or in any . . . navigable water of the United States until the consent of Congress to the building of such structures shall have been obtained and until the plans for the same shall have been submitted to and approved by the Chief of Engineers and by the Secretary of the Army . . . .
 Section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403, provides in pertinent part as follows:
 The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any . . . water of the United States . . . except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army; and it shall not be lawful to excavate or fill . . . within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same.
 
 
 [5]
 On July 19, 1977, the Corps published a recompilation of its regulations covering permit applications. The equivalent of the regulation here cited is now found at 33 C.F.R. § 321.2(a), under Part 321, "Permits for Dams and Dikes in Navigable Waters of the United States," and at 33 C.F.R. § 322.2(a), under Part 322, "Permits for Structures or Work in or Affecting Navigable Waters of the United States," both published at 42 Fed.Reg. 37139 (July 19, 1977). These new sections, which are identical in wording, provide:
 The term "navigable waters of the United States" means those waters of the United States that are subject to the ebb and flow of the tide shoreward to the mean high water mark (mean higher high water mark on the Pacific coast), and/or are presently used, or have been used in the past, or may be susceptible to use to transport interstate or foreign commerce. See 33 C.F.R. Part 329 for a more complete definition of this term.
 There has been no substantive change from the July 25, 1975 regulation.
 
 
 [6]
 This regulation is now found in identical form at 33 C.F.R. § 329.12(a) (2), as published at 42 Fed.Reg. 37163 (July 19, 1977)
 
 
 [7]
 One of these is unreported, United States v. Freethy, No. 73-1470 (N.D.Cal. Feb. 24, 1975); the other makes only passing mention of the use of the MHHW line as the Corps's limit of jurisdiction, United States v. Kaiser Aetna, 408 F.Supp. 42, 50 n.18 (D.Hawaii 1976), appeal docketed, No. 76-1968 (9th Cir. May 3, 1976)
 
 
 [8]
 Aside from Freethy, supra, and Kaiser Aetna, supra, the only other reported Pacific coast Rivers and Harbors Act case is this Court's decision in United States v. Sunset Cove, 514 F.2d 1089 (9th Cir.), cert. denied, 423 U.S. 865, 96 S.Ct. 125, 46 L.Ed.2d 94 (1975). In Sunset Cove, the parties stipulated to use of the MHW line as the extent of federal regulatory jurisdiction
 
 
 [9]
 In distinguishing Borax, the district court apparently relied in part on the fact that the Supreme Court made no reference to the relatively large difference between MHHW and MHW on the Pacific coast. Sierra Club v. Leslie Salt, supra, 412 F.Supp. at 1101. We note, however, that in concluding that the MHW line is the lateral boundary of a tidal water body on the Pacific coast, the Borax court relied on a United States Coast and Geodetic Survey publication which clearly described the phenomenon of diurnal inequality between MHHW and MHW on the Pacific coast. H. A. Marmer, Tidal Datum Planes, U. S. Coast and Geodetic Survey (Special Publication No. 135), at 5-7, 74-97, 125-127 (1927). Borax, supra, 296 U.S. at 23, 26-27, 56 S.Ct. 23. Moreover, in its brief before the Supreme Court in Borax, the respondent City of Los Angeles stated:
 The courts, in the cases cited by petitioners, point out that the boundary line is not the limit reached by the "unusual" or "extraordinary" high tides. Why then should it be fixed as the limit reached by unusual or extraordinary low high tides? The respondent is not contending in this action that the boundary line between tideland and upland is the limit reached by the unusual or extraordinary high tides. Neither is it contending that the boundary line is the mean of the higher high tides.
 Brief on Behalf of Respondent at 84, Borax, supra, 296 U.S. 10, 56 S.Ct. 23, 80 L.Ed. 9 (1935) (emphasis added). Thus, the Supreme Court's attention was in fact drawn to the MHW-MHHW distinction.
 
 
 [10]
 The Corps's deference to the courts in defining "navigable waters" may explain the apparent uncertainty which it had, prior to the publication of the first Public Notice on June 11, 1971, about the limits of its jurisdiction. At hearings in May and August of 1969 before the Conservation and Natural Resources Subcommittee of the Committee on Government Operations of the U.S. House of Representatives, Corps officials testified that the Corps's regulatory jurisdiction over San Francisco Bay waters extended to the line of MHHW. However, on January 28, 1971, the division engineer of the Corps's South Pacific Division, Brig. Gen. Frank A. Camm, sent a letter to a representative of the Sierra Club stating that the Corps's jurisdiction over San Francisco Bay extended only to "those waters that were in fact capable of being used for navigation." Hence, said General Camm, "the extent of our jurisdiction in the bay would be the line of mean higher high water (MHHW), except that in marshland areas it would be the outer edge of the marsh grass." House Committee on Government Operations, Increasing Protection for Our Waters, Wetlands, and Shorelines: The Corps of Engineers, H.R.Rep. No. 1323, 92d Cong., 2d Sess. 27 (1972)
 The congressional subcommittee asked the Secretary of the Army to explain the discrepancy between the Corps's earlier testimony and General Camm's statement. In response, Under Secretary of the Army, Thaddeus R. Beal, stated in a letter of June 16, 1971, that the Corps's jurisdiction:
 . . . extends to the entire surface of a water body once a major channel within that water body has been found to be navigable . . .. Thus, the "navigable waters" of San Francisco Bay include areas laid bare at low tide, as well as areas presently occupied by marsh grasses but nevertheless subject to normal tidal inundation. Confusion has arisen because physical marks (such as cuts on banks, the edge of terrestrial plant growth, or the edge of marsh grass) have often been accepted as the dividing line between land and water, or roughly equivalent to the line of mean high water. Indeed, early surveys often accepted such lines for purposes of delineating property ownership boundaries. While such lines are useful for general purposes, they cannot be used to delineate "navigable waters" for purposes of legal jurisdiction.
 Although local custom has in the past justified the use of readily recognizable boundary lines, such as the grass line in San Francisco Bay, the need for a uniform national policy has become evident. Accordingly, we have requested that our Division Engineer for the South Pacific adopt the line on the shore reached by the plane of the mean of the higher high waters as the limit of Federal permit jurisdiction.
 In its report, the subcommittee correctly called this statement a "new policy" which "broadened" the Corps's jurisdiction. Id. at 27-29 (emphasis added).
 It should be noted that the purpose of these hearings was to examine the Corps's policy of requiring permits only for activities which affected navigation per se ; the Committee's reports focused on urging that the Corps broaden its scope of permit review to consider all ecological factors under applicable environmental protection statutes. The Corps was also criticized for its past failure to require permits for activities in arguably navigable waters of San Francisco Bay. The question of the exact boundary of tidal navigable waters on the Pacific coast was not directly raised, and the relative merits of using MHHW rather than MHW were not discussed. Indeed, as seen, there was apparently some confusion on the part of the Corps as to what the boundaries of its jurisdiction were. Compare, testimony of General Glasgow, August 20, 1969, with his responses to questioning by Congressman McCloskey, in House Committee on Government Operations, Protecting America's Estuaries: The San Francisco Bay and Delta, H.R.Rep. No. 1433, 91st Cong., 2d Sess., 51-53 (1970).
 Thus, it is apparent that the Corps, feeling chastened by congressional criticism of its policies, sought to make up for past mistakes by enunciating a new, broadened definition of its regulatory jurisdiction. At no point did Congress or a single congressional committee specifically authorize or even consider the use of MHHW as opposed to MHW on the Pacific coast.
 
 
 [11]
 The difference between morning and afternoon tides is known as "diurnal inequality." Like the monthly variations between spring and neap tides, it is brought about by variations in the declination of the moon relative to the earth. Since the difference between MHHW and MHW is relatively greater on the Pacific coast, the Corps argues that its use of MHHW on the Pacific is more consistent with use of MHW elsewhere than if it simply applied MHW everywhere
 However, there are so many exceptions to the basic pattern of greater diurnal inequality on the Pacific coast than the Atlantic that the Corps's policy cannot be said to produce any "harmony." The three tide types form a continuum from semidiurnal to mixed to diurnal. As diurnal inequality increases the lower high water and higher low water tend to become equal and merge. When this occurs, there is but one high and one low water in a tidal day instead of two. Thus, this diurnal or "daily" type of tide, which is found on the Gulf coast, is actually an extreme form of the mixed type of tide found on the Pacific coast, just as the mixed tide type is a more extreme form of the semidiurnal type.
 As reported in the USGS publication relied on by the Supreme Court in Borax, supra, there are tremendous variations in the amounts of diurnal inequality found at various points on the different coasts. For example, there is greater diurnal inequality at Baltimore, Maryland, on the Atlantic coast, than at either Astoria, Oregon or Humboldt Bay, California, both on the Pacific coast. Since the difference between the once a day diurnal type of tide and the mixed tide type is strictly a matter of degree, it is not surprising that some places on the Gulf coast such as the southern end of Florida and parts of Texas actually experience Pacific-type diurnal inequality. On the other hand, the Alaskan coast (presumably part of the Pacific coast for Corps purposes) has tremendous variations all along the spectrum, from Atlantic-type semidiurnal tides at Ketchikan, Juneau, and Anchorage; to Pacific-type mixed tides at Sitka, Kodiak, and Point Barrow; to Gulf-type diurnal tides at Dutch Harbor and St. Michael.
 In view of these inconsistencies in diurnal inequality, it is difficult to see the rationality of using a different standard for the Corps's jurisdiction on the Pacific coast in order to bring about an asserted uniformity. H.A. Marmer, Tidal Datum Planes, U.S. Coast and Geodetic Survey (Special Publication No. 135), at 5-7, 74-83 (1927).
 
 
 [12]
 Leslie's concession is well taken, since the case law clearly supports an expansive reading of the term "navigable waters" as used in the FWPCA, 33 U.S.C. § 1251, et seq. In United States v. Holland, 373 F.Supp. 665 (M.D.Fla.1974), the district court, in an excellent analysis, held that the discharge of "sand, dirt and dredged soil on land which, although above the mean high water line, was periodically inundated with the waters of Papy's Bayou" was within the reach of the FWPCA, since Congress intended to control the discharge of pollutants into waters at the source of the discharge, regardless of its location vis-a-vis the MHW or MHHW lines. The court stated that:
 . . . the mean high water line is no limit to federal authority under the FWPCA. While the line remains a valid demarcation for other purposes, it has no rational connection to the aquatic ecosystems which the FWPCA is intended to protect. Congress has wisely determined that federal authority over water pollution properly rests on the Commerce Clause and not on past interpretations of an act designed to protect navigation. And the Commerce Clause gives Congress ample authority to reach activities above the mean high water line that pollute the waters of the United States.
 The defendants' filling activities on land periodically inundated by tidal waters constituted discharges entering "waters of the United States" and, since done without a permit, were thus in violation of 33 U.S.C. § 1311(a).
 Holland, supra, 373 F.Supp. at 676.
 The legislative history of the FWPCA reviewed by the Holland court amply supports its conclusion.
 
 
 [13]
 The FWPCA defines "navigable waters" as "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7)
 
 
 [14]
 See n.3, supra
 
 
 [15]
 The Act itself defines the term "navigable waters" broadly: "waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7). See n.13, supra. The bill submitted to the Senate as S. 2770 defined "navigable waters" as "the navigable waters of the United States, portions thereof, and the tributaries thereof, including the territorial seas and the Great Lakes." 2 Legislative History of the Water Pollution Control Act Amendments of 1972, at 1698 (hereinafter cited as Legislative History). The report of the Senate Committee on Public Works submitted with the bill explained:
 The control strategy of the Act extends to navigable waters. The definition of this term means the navigable waters of the United States, portions thereof, tributaries thereof, and includes the territorial seas and the Great Lakes. Through a narrow interpretation of the definition of interstate waters the implementation (of the) 1965 Act was severely limited. Water moves in hydrologic cycles and it is essential that discharge of pollutants be controlled at the source. Therefore, reference to the control requirements must be made to the navigable waters, portions thereof, and their tributaries.
 Id. at 1495 (emphasis added).
 The House of Representatives bill, H.R. 11896, contained a more restrictive definition of "navigable waters": "the navigable waters of the United States, including the territorial seas." 1 Legislative History at 1069. When the two bills went to Conference Committee, the word "navigable" was deleted from the definition. The Conference Report explained that:
 The conferees fully intend that the term "navigable waters" be given the broadest possible constitutional interpretation unencumbered by agency determinations which have been made or may be made for administrative purposes.
 Conference Report, S.Rep. No. 1236, 92d Cong., 2d Sess., 144, reprinted in (1972) U.S.Code Cong. & Admin.News p. 3822; reprinted in 1 Legislative History at 327.
 In presenting the Conference version to the House, Representative Dingell, a member of the Conference Committee, explained the Committee's intention in defining federal water pollution control jurisdiction even more clearly:
 . . . the conference bill defines the term "navigable waters" broadly for water quality purposes. It means all "the waters of the United States" in a geographical sense. It does not mean "navigable waters of the United States" in the technical sense as we sometimes see in some laws.
 
 
 [1]
 Legislative History at 250. After discussing the effect of judicial decisions expanding the old test of navigability, Representative Dingell concluded:
 Thus, this new definition clearly encompasses all water bodies, including main streams and their tributaries, for water quality purposes. No longer are the old, narrow definitions of navigability, as determined by the Corps of Engineers, going to govern matters covered by this bill.
 
 
 [16]
 This section sets out the definitions used in Part 323, which covers permits for discharges of dredged or fill material into waters of the United States pursuant to Section 404 of the FWPCA. In pertinent part, § 323.2 provides as follows:
 For the purpose of this regulation, the following terms are defined:
 (a) The term "waters of the United States" means:
 (1) The territorial seas with respect to the discharge of fill material . . .;
 (2) Coastal and inland waters, lakes, rivers, and streams that are navigable waters of the United States, including adjacent wetlands ;
 (3) Tributaries to navigable waters of the United States, including adjacent wetlands (manmade nontidal drainage and irrigation ditches excavated on dry land are not considered waters of the United States under this definition);
 (4) Interstate waters and their tributaries, including adjacent wetlands ; and
 (5) All other waters of the United States not identified in paragraphs (1)-(4) above, such as isolated wetlands and lakes, intermittent streams, prairie potholes, and other waters that are not part of a tributary system to interstate waters or to navigable waters of the United States, the degradation or destruction of which could affect interstate commerce.
 (c) The term "wetlands" means those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs and similar areas.
 (d) The term "adjacent" means bordering, contiguous, or neighboring. Wetlands separated from other waters of the United States by man-made dikes or barriers, natural river berms, beach dunes, and the like are "adjacent wetlands."
 (Emphasis added; footnotes omitted).
 These definitions were published as part of the regulatory recompilation mentioned in note 5, supra. On July 25, 1975, the Corps issued interim regulations defining "navigable waters of the United States" for purposes of the FWPCA. These regulations, which were found at 33 C.F.R. § 209.120(d)(2), differed in only minor respect from the more recent regulations quoted above. While the now superseded interim regulations were published before the district court's March 11, 1976 opinion holding that the Corps's FWPCA jurisdiction extends to the former line of MHHW, the July 19, 1977 recompilation was published after that decision. This court should apply the laws and regulations "in effect at the time it renders its decision." Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 419, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971); Thorpe v. Housing Authority, 393 U.S. 268, 281, 89 S.Ct. 518, 21 L.Ed.2d 474 (1968).