**BROMLEY CONTRACTING CO., INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 528–84C.

United States Claims Court.

June 20, 1988.

OPINION

REGINALD W. GIBSON, Judge:

On October 17, 1984, Bromley Contracting Co., Inc. (Bromley or plaintiff) filed a complaint in this court seeking damages in—the sum of $2,282,641.05 allegedly due it pursuant to 31 miscellaneous requests for change orders which it filed; the sum of $150,000 for overhead and expenses claimed incurred due to negotiations with and preparation of presentations to defendant; and the sum of $273,689.32 for interest expenses incurred on loans taken out by plaintiff to finance performance of the extra work represented by the above-mentioned change orders.

▇ Now, before the court, Bromley moves for partial summary judgment seeking to establish monetary entitlement[1] on only 14 of the 23[2] remaining claims for expenses arising from the claimed performance of extra work under a building restoration contract (contract No. 031–78–511) with the Department of Housing and Urban Development (HUD or defendant). Plaintiff has filed its action in this court after submitting duly certified claim(s) to the contracting officer and following its failure to receive a final decision from said contracting officer under the direct access provisions of the Contract Disputes Act of 1978, 41 U.S.C. §§ 609 and 605(c)(5) (1987). Defendant opposes plaintiff's partial motion for summary judgment and points to a plethora of genuine issues of material fact which requires the denial of plaintiff's motion. Because we agree, in that we have found that plaintiff fails to meet its initial

Martin J. Cohen, New York City, Atty. of Record, for plaintiff.

Sharon Y. Eubanks, Washington, D.C., with whom was Asst. Atty. Gen. John R. Bolton, for defendant.

1. The parties agree that this case is bifurcated, thus plaintiff now seeks only to establish entitlement, *i.e.*, liability. Quantum, with respect to any or all of the 14 claims, if required, will be established hereafter through a separate proceeding.

2. On July 23, 1987, the parties filed a Stipulation for Entry of Partial Judgment regarding eight of the 31 claims for $85,000, plus interest. The partial judgment settled plaintiff's designated claims M–2 (electric work); M–3 (roof flashing extra); M–5 (extra interior cracks); M–9 (extra window work); M–10 (repair sills); M–11 (extra weep holes); M–12 (extra probe holes); and M–27 (profit and overhead). The court also notes that plaintiff has filed several other claims

under this contract with the HUD Board of Contract Appeals: a claim for reformation of the contract (HUDBCA No. 81–624–C30); a claim for losses (HUDBCA No. 85–969–C15); and a claim for additional amounts under the government's change orders 1 through 40 (HUDBCA No. 85–911–C3). When a single government contract gives rise to separate claims, the contractor has the option to file two or more suits in the same forum or in different forums. *Walsky Constr. Co. v. United States,* 3 Cl.Ct. 615, 618 (1983), and cases cited therein. Thus, of the remaining 23 claims, only 14 are now pending before this court for decision pursuant to plaintiff's partial motion for summary judgment.

burden of demonstrating to the court the *absence* of genuine issues of material fact and further that defendant successfully raises a host of material and genuine issues of fact as detailed below, plaintiff's motion must be denied with respect to each of the claims averred.

*Statement of Facts*

Bromley responded to the invitation for bids, issued by HUD on December 16, 1977, with the low bid in the amount of $342,832 for the restoration of the brick facade of a 26–story HUD building located in Newark, New Jersey, known as Weequahic Park Plaza. HUD, as a consequence, awarded the lump sum one-year repair contract to Bromley on March 7, 1978. The bid package contained an additional schedule by which the bidders indicated a proposed unit price for each of the 17 types of repair work to be performed under the contract. The schedule, as completed by plaintiff, was styled "Proposed Costs to Renovate Existing Facade—Additional Work." Plaintiff entered a unit price for each item and was instructed by said schedule that "[a]ll figures should be in-place costs including *overhead* and profit." (emphasis added). Bromley submitted the completed proposed cost schedule to HUD along with its lump sum bid on the project. Notwithstanding the lump sum contract, plaintiff anticipated the *necessity* for extra work under the contract. In fact, the vice-president of Bromley admitted that he expected the need for extra work in some repair items and that he had calculated the price entries on the Cost Proposal to gain a bargaining advantage on extra work required after the contract award.[3] Bromley commenced performance under the contract on April 7, 1978. Thereafter, on April 24, 1978, HUD held a post-award meeting at which Melvin Bloom represented Bromley. In the context of that meeting, defendant's representative indicated that the Cost Proposal schedule submitted by plaintiff would be used as a basis for pricing additional work that was necessary to the project but not within the specifications.

(*Id.; see also* Defendant's Memorandum of April 28, 1978, Defendant's App. I, pp. 29–30.)

In addition to Bromley, HUD also contracted with the consulting and research engineering firm of Wiss, Janney Elstner Associates, Inc. (WJE) to serve as HUD's on-site representative to inspect and monitor plaintiff's performance for the duration of the contract. WJE, under its contract, in essence functioned as a conduit for change orders by proposing any putative change orders, which comprised additional work above the contract specifications, to the contracting officer for verbal approval prior to performance. Throughout the performance period of the contract, Bromley had actually received compensation for extra work stemming from 40 change orders generated in this fashion which aggregated approximately $809,160. By this action, plaintiff now seeks the aggregate additional amount of $2,706,330.37 for extra work completed over and above the initial extra work, valued at $809,160, for which it has already been paid.

In his Memorandum for the Record dated July 18, 1979, Contracting Officer Granata indicated that he had discussed with Bromley's representatives, in a meeting held on the same day, that plaintiff had performed work that had been neither inspected by WJE nor *approved* in advance by the contracting officer. Granata further emphasized that the procedure of prior approval for future *extra* work (change orders) would have to be followed.

As performance continued until September 1980, plaintiff, allegedly, unilaterally chose to shut down its operation for the winter of 1978 as well as the winter of 1979, for an approximate total period of six months. These winter cessations were *not* imposed by contract provisions.

■ HUD has paid Bromley $1,151,992 (*i.e.,* $342,832 for *contract* work and $809,-160 for extras) for work performed under the contract. On April 29, 1981, plaintiff submitted to the contracting officer its certified claim for a "final equitable adjust-

---

**3.** Findings of Fact in *Bromley Contracting Co.,*   *Inc.,* HUDBCA No. 81–624–C30.

ment" in the amount of $2,282,641.05.[4] These claimed costs were based on extra work allegedly performed by plaintiff and itemized as "Miscellaneous Change Orders M1 thru [sic] M31." The contracting officer did not issue a final decision regarding any of these 31 claims. However, with respect to said claims, defendant did request an audit from the Office of the Inspector General of the Department of Housing and Urban Development with respect to same. This report dated March 18, 1983, found certain of Bromley's asserted claimed costs to be "unauthorized; incorrect as to unit price, pay rate, and quantity used; and duplicated or unsupported." *See* Defendant's App. II, pp. 332–338. The audit report further contends that "[n]one of the change orders had been properly submitted or approved." Said report concluded that most of the claimed costs for alleged extra work were unresolved (*i.e.*, neither clearly eligible or ineligible for reimbursement) and that further documentation was necessary to resolve the eligibility of these costs. Further, in HUD's Analysis and Reply to Miscellaneous Claims dated May 25, 1984, HUD contends that the extra work for which plaintiff sought additional costs were *either* already paid for under other change orders, not directed or approved by the contracting officer, not specified in any authorized change order, or not detailed enough to prevent duplication of payments. *See* Plaintiff's App. II, pp. 305–310.

## Contentions of the Parties

### A. Plaintiff

Bromley hospitably and blandly argues, in its motion for partial summary judgment on its 14 claims, that no genuine issues of material fact impede this court from finding, as requested, its entitlement to compensation for the extra work it performed beyond the contract specifications. The predicate for plaintiff's position is an alleged agreement with defendant that was reached in the context of a formal meeting held on July 18, 1979. According to plaintiff, and as contemplated in that meeting, defendant agreed/acknowledged that Type I differing site conditions existed, and it further agreed to pay plaintiff's extra performance costs prior to Bromley's undertaking the extra work necessitated by the changed conditions. Consistent with the *alleged* agreement, plaintiff therefore seeks recovery under the Differing Site Condition Clause of the contract. Further, plaintiff contends, alternatively, that its entitlement to recovery on these 14 claims is founded upon any/all of the three following bases. First, the contract work was suspended due to the extra work required by the inadequate specifications; and compensation, therefore, is due under the Suspension of Work Clause within the contract. Second, it argues that plaintiff received defective specifications for the project in that they failed to disclose the true nature and extent of the work required. To this plaintiff adds that the government is bound by an implied warranty that its contract specifications accurately include all work requirements. Therefore, concludes plaintiff, the government breached this warranty and compensation is consequently due. And third, the government is in breach of contract due to numerous changes in the specifications that went far beyond the scope of changes covered by the Changes Clause within the contract, *i.e.*, there were cardinal changes.

### B. Defendant

Conversely, and in opposition to plaintiff's motion, the government maintains

---

**4.** The court notes that Bromley has brought two claims in addition to the claim for a final equitable adjustment in this court that are not included in plaintiff's partial summary judgment motion and that may not have been submitted to the contracting officer for a decision as required by the Contract Disputes Act, 41 U.S.C. § 605(a). First, Bromley's claim for $150,000 for overhead and expenses, and second, the claim for $273,689.32 that plaintiff made for interest expenses are not reflected in plaintiff's allegation number 4 as being part of the claim submitted to the contracting officer for decision. *See* Plaintiff's Amended Complaint. The apparent effect of this failure to submit these claims to the contracting officer for decision is a preclusion of this court's ability to decide these claims due to lack of jurisdiction. *Paragon Energy Corp. v. United States,* 227 Ct.Cl. 176, 645 F.2d 966 (1981). *See* the Conclusion of this opinion, *infra,* for the court's response to this issue.

that it never agreed that differing site conditions existed, and also never assumed the responsibility of paying plaintiff's extended performance costs. *See* Defendant's Response and Opposition, p. 15 n. 4. Further, plaintiff has already been compensated adequately for a number of its claims, and the other claims were *never* authorized by the government, according to defendant. On each of plaintiff's claims now presented for partial summary judgment, defendant vehemently disputes the operative facts upon which Bromley bases the existence of its claims and thus postures genuine issues of material facts. Moreover, defendant contends that plaintiff has failed to establish a *prima facie* entitlement to recovery on its claims based on differing site conditions, government-caused delay, defective specifications, or breach of contract due to changes that were outside the general scope of the contract.

*Issues Presented*

The threshold issue presented to the court by plaintiff's motion, and defendant's opposition, is—whether plaintiff has met its burden under Rule 56(c) of *demonstrating* to the court that no genuine issues of material fact arise either under any claimed legal basis of recovery as well as in regard to the factual bases of the averred claims for extra work. If plaintiff has met its initial burden, then, of course, the burden of going forward shifts to defendant, as the non-movant, who must produce evidence that raises genuine issues of material fact under Rule 56(f). Since we find that plaintiff clearly fails to meet its initial burden, it is not necessary to inquire into the sufficiency of defendant's burden of going forward. Nevertheless, we find that defendant has raised such significant issues of material fact that they permeate even the foundations, *i.e.*, the elements, of each of plaintiff's legal theories.

*Discussion*

A. *Summary Judgment Standard*

Bromley has moved for *partial* summary judgment as to its entitlement to compensation on the 14 claims before the court under RUSCC 56(c), which provides as follows:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, *show* that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.

(emphasis added). The foregoing language tracks the language of the Federal Rules of Civil Procedure, Rule 56(c), and, with respect thereto, the Supreme Court has held that this language imposes an *initial* burden on the moving party to inform the court of the basis for its motion and to *demonstrate* through its filings that no genuine issue of material fact exists as to its claim for relief. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *see also Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). For example, in *Adickes,* the Supreme Court points out that in its comments to the Federal Rules, the Advisory Committee stated that "[w]here the evidentiary matter in support of the motion does not establish the *absence* of a genuine issue, summary judgment must be denied *even if no opposing evidentiary matter is presented.*" *Id.* at 160, 90 S.Ct. at 1609–10 (emphasis in original and added). In viewing the movant's evidence, upon application of the rule, all factual inferences drawn from the movant's submissions must be viewed in the light most favorable to the *non-movant, i.e.,* here the defendant. *United States v. Diebold,* 369 U.S. 654, 655, 82 S.Ct. 993, 944, 8 L.Ed.2d 176 (1962). Further, any doubt as to whether there is a genuine issue of material fact will be resolved in favor of the non-moving party. *Adickes,* 398 U.S. at 158, 90 S.Ct. at 1609. *See also Campbell v. United States,* 2 Cl.Ct. 247, 249 (1983). Thus, it is axiomatic that, if the moving party fails to meet its initial burden under Rule 56(c), it has no entitlement to summary judgment.

On the other hand, once the moving party has adequately met its *prima facie* burden in establishing that no issues of material fact exist, then the burden of going forward shifts to the non-movant under Rule 56(f), which states:

When a motion for summary judgment is made *and supported as provided in this rule,* an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

(emphasis added). The non-movant's burden to set forth the *specific* facts that generate the issue for trial, therefore, is not met by reliance on its pleadings alone, or by conclusory allegations and generalities. *Campbell,* 2 Cl.Ct. at 249. Additionally, the non-movant does not survive the perils of such motion by merely showing that some "metaphysical doubt" exists as to the material facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed. 2d 538 (1986). The final or ultimate test for the non-movant's discharge of its burden raises the question—that when the record is taken as a whole, given the countervailing facts postured, is sufficient evidence supporting the claimed factual dispute shown to require a trier of fact to resolve the parties' differing versions of the facts? If not, then there is no genuine issue of fact for trial. *First National Bank of Arizona v. Cities Services Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968).

B. *Plaintiff As Movant Fails To Meet Its Initial Burden Under Rule 56(c)*

■ In its motion for partial summary judgment, Bromley strenuously seeks a judgment as to entitlement to recovery on the following claims: M–1 Winter Shutdown; M–4, M–7, M–16, and M–23 Additional Work on Roof Deck; M–6 and M–8 Demobilization and Remobilization; M–14 Extended Scaffold Rental; M–21 and M–22 Increased Wages and Increased Insurance Rates; M–26 Electrical Work; M–28 Correct No. 4 to No. 5 Repairs; M–29 Inspection and Exploration; and M–30 Extended Overhead Cost. Recovery on *all* claims, plaintiff contends, is due under any or all of the following legal theories: (1) the express oral agreement between the parties that differing site conditions existed and that defendant would pay plaintiff's costs of extended performance caused by the differing conditions; (2) the contract's Suspension of Work Clause; (3) a cardinal change beyond the scope of the contract's Changes Clause; (4) the Differing Site Condition Clause of the contract; and (5) the existence of defective specifications. In analyzing plaintiff's motion under the RUSCC 56 standard articulated above, the court shall proceed by focusing on each legal theory, the factual contentions that plaintiff points to as establishing the absence of material facts, and the deficiencies, if any, in plaintiff's evidence that raise material fact questions. The court shall then focus on defendant's countering submission as the non-movant.

The first legal basis for recovery, argued by plaintiff, is that defendant *agreed* that differing site conditions existed and that defendant further agreed to pay plaintiff's resulting increased costs of performance. In support of this basis of recovery, plaintiff points to and embraces a letter, dated July 20, 1979, that it (plaintiff) wrote to defendant purporting to document the *agreements* reached, in the context of a meeting between the parties, on July 18, 1979. Therein, plaintiff stated:

It was agreed and acknowledged by all parties that the extended performance period into 1979 is the direct result of changed conditions, namely the vastly increased amounts of extra work necessary. It was discovered after construction commenced that there was additional deterioration since the specifications were prepared in early 1977. It was understood between all parties that neither WJE, HUD or the contractor, could have been aware of the added requirements which were necessary, and which

resulted in only $60,000 worth of contract work being performed in 1978 and over $400,000 of extra work mandated by the unseen failures which occurred in the interim. It was further agreed that because of this situation and conditions, Bromley would submit its increased costs due to the extended performance period at the time of substantial completion, as many of the costs which are continuing, cannot be estimated at this time. It is also agreed that the burden of proof will be on Bromley to justify its costs before settlement thereof.

Given the foregoing, it is significant to note, however, that Bromley produces no corroborating evidence of the government's alleged agreement and offer to pay for plaintiff's extended performance costs other than this self-serving, unilateral letter that merely contains recitations of conclusory allegations of the asserted agreement regarding the existence of "changed conditions" at the site. Further, on this record, we find that this letter in no way demonstrates the existence of an open-ended agreement by the government to pay all the costs of plaintiff's performance. In fact, the letter tends to belie the ultimate conclusion postured by the plaintiff in that it states that "[i]t was further agreed that ... Bromley would submit its increased costs due to the extended performance period" and "that *the burden of proof will be on Bromley to justify its costs* before settlement thereof." (emphasis added). Thus, plaintiff's own letter shows that plaintiff was to submit costs and *prove* entitlement rather than merely submitting costs for *pre-agreed payment.* In addition to the foregoing genuine issue, some material factual questions that we see regarding plaintiff's conclusory allegation of an express oral agreement, are—Who, with contracting authority, made this offer to plaintiff? What were the terms of the agreement? Why wasn't this "agreement" reduced to writing as a contract modification or change order since the government did previously authorize 40 change orders, in writing, under plaintiff's contract? The court finds that the foregoing genuine issues, by way of illustration, are more than

sufficient to establish that plaintiff has failed to demonstrate the absence of material fact issues regarding its claim to entitlement under the theory of an express oral contract.

As a subsidiary argument to the above oral agreement theory, plaintiff contends that defendant agreed that differing site conditions existed and, consequently, plaintiff seeks a judgment entitling Bromley to compensation under the Differing Site Condition Clause as a Type I differing condition. The Differing Site Condition Clause of the contract provides that:

(a) The Contractor shall promptly, and before such conditions are disturbed, notify the Contracting Officer in writing of: (1) Subsurface or latent physical conditions at the site differing materially from those indicated in this contract, or (2) unknown physical conditions at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in this contract. The Contracting Officer shall promptly investigate the conditions, and if he finds that such conditions do materially so differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performance of any part of the work under this contract, whether or not changed as a result of such conditions, an equitable adjustment shall be made and the contract modified in writing accordingly.

(b) No claim of the Contractor under this clause shall be allowed unless the Contractor has given the notice required in (a) above; provided, however, the time prescribed therefor may be extended by the Government.

To support its contention that the parties had agreed regarding the existence of the Type I differing site condition, plaintiff points to the same letter of July 20, 1979, discussed above. As stated previously, we find this letter to be transparently self-serving as ultimate proof, void of any corroborative evidence, since it merely represents plaintiff's position with no acknowledgement by defendant of a meeting of the

minds as to the existence of subsurface conditions at the site that differed materially from the conditions indicated in the contract. Thus, against this background, the substantial fact question arises as to— whether defendant did indeed agree to the existence of differing conditions.

Moreover, pursuant to the Differing Site Condition Clause, it is clear that "[n]o claim of the Contractor under this clause shall be allowed unless the Contractor has given the notice required in (a) above [*i.e.,* prompt written notice prior to disturbing the condition]: provided, however, the time prescribed therefor may be extended by the Government." Plaintiff points to the document that would serve as evidence of the required written notice. Further, in order to obtain relief under this clause, the contractor must also show that it encountered a subsurface physical condition that differed *materially* from the conditions that are indicated in the contract documents. But plaintiff fails to address the material fact question implicit in the application of this clause. That question is—did the subsurface condition exist at the time the contract was entered into, or arise thereafter? In Bromley's letter to defendant of July 20, 1979, we note that plaintiff states that "It was discovered after construction commenced that there was additional deterioration *since the specifications were prepared in 1977.*" (emphasis added). This statement is ambiguous at best as to when the additional deterioration occurred, and clearly raises genuine issues as to whether it occurred before or after contract award. Did the deterioration occur after the contract was awarded due to weather conditions? These threshold issues of fact, material to recovery under the clause, in our judgment, are sufficient to preclude the granting of summary judgment on this theory of recovery.

As an alternative basis of recovery, plaintiff further claims that it has an entitlement under the Suspension of Work Clause of the contract due to the unreasonable delay caused by the alleged defective specifications of the government. The Suspension of Work Clause provides, in pertinent part:

(b) If the performance of all or any part of the work is, for an unreasonable period of time, suspended, delayed, or interrupted by an act of the Contracting Officer in the administration of this contract, or by his failure to act within the time specified in this contract (or if no time is specified, within a reasonable time), an adjustment shall be made for any increase in the cost of performance of this contract (excluding profit) necessarily caused by such unreasonable suspension, delay, or interruption and the contract modified in writing accordingly. However, no adjustment shall be made under this clause for any suspension, delay, or interruption to the extent (1) that performance would have been so suspended, delayed, or interrupted by any other cause, including the fault or negligence of the Contractor or (2) for which an equitable adjustment is provided for or excluded under any other provision of this contract.

In its effort to substantiate its claim under this clause, plaintiff makes the conclusory allegations that defendant had superior knowledge and misrepresented the true site conditions in the contract specifications. Yet in its own letter to defendant of July 20, 1979, plaintiff concedes that "[i]t was understood between all parties that neither WJE, HUD or the contractor, could have been aware of the added requirements which were necessary...." This admission by plaintiff of defendant's absence of awareness of the conditions that created the alleged extra work requirements directly contradicts the assertion of defendant's superior knowledge that plaintiff makes here. Additionally, Bromley fails to point to any circumstances, admissions, or documents to support its claim of defendant's superior knowledge as to any deficiencies. Finally, plaintiff points to no specific acts or omissions by the contracting officer that created a delay in its contract performance. It is important to note that the clause specifically states that compensation is not available for delay due to causes other than causes by the government, including acts of the contractor. Here, a genuine and

material fact issue is generated by the contractor's alleged unilateral shutdown for the 1978 and 1979 winters for which Bromley points to no authorization by HUD for these shutdowns. Moreover, the Suspension of Work Clause also excludes delays that are compensable under any other contract clauses. Here, since 40 approved change orders under the Changes Clause were issued and paid, the question clearly is whether those change orders covered and compensated plaintiff for part or all of the extended performance recovery sought at this point under this clause. These unresolved material fact issues argue strongly for the preclusion of summary judgment for plaintiff.

As a corollary argument to the Suspension of Work Clause basis of recovery, plaintiff also argues that the government issued defective specifications with knowledge that those specifications were inadequate in that they did not include all the work requirements and failed to disclose the true nature of the work. Therefore, plaintiff seeks entitlement to recovery on the basis of defective specifications that had the effect of a change that increased the contractor's cost of performance. Plaintiff here, in support of its argument, only blandly alleges that the government knew that the specifications were inadequate and fails to affirmatively show specific factual evidence to answer the following material questions: (1) whether Bromley was unable to obtain information regarding the work required through normal investigation; (2) whether the government knew that Bromley did not have this information; and (3) what specific facts made the specifications unreasonably inaccurate. Moreover, and as previously noted, plaintiff's own letter to defendant dated July 20, 1979, stated that "[i]t was understood between all parties that neither WJE, HUD or the contractor, could have been aware of the added requirements which were necessary...." Thus, it can be seen that plaintiff's own letter clearly contradicts the position taken here that the government failed to disclose information at its disposal. Based on the above vague and conclu-

sory statement of plaintiff, we are constrained to deny its motion on that issue.

As a final basis of recovery, plaintiff asserts that the disputed changes to the contract, which embraced the extra work performed, were so major as to be outside the scope of the contract's Changes Clause, and, as such, so constituted a cardinal change. The Changes Clause permits defendant to make "any change in the work within the general scope of the contract." However, a cardinal change occurs only when the project ultimately constructed is not essentially the same as the one that the parties contracted to construct. *Air–A–Plane Corp. v. United States*, 187 Ct.Cl. 269, 275, 408 F.2d 1030, 1033 (1969). The recognized standard for evaluating whether the change "altered the nature" of the thing constructed is a consideration that must be made on a case-by-case basis of both the magnitude and the quality of the modification. *Id.*, 187 Ct.Cl. at 276, 408 F.2d at 1033, quoting *Saddler v. United States*, 152 Ct.Cl. 557, 561, 287 F.2d 411, 413 (1961). Illustrative of the foregoing, the Court of Claims held in *Wunderlich Contracting Co. v. United States*, 173 Ct.Cl. 180, 194, 351 F.2d 956, 966 (1965), that:

> There is no exact formula.... Each case must be analyzed on its own facts and in light of its own circumstances, giving just consideration to the magnitude and quality of the changes ordered and their cumulative effect upon the project as a whole.

Thus, in order to determine whether changes are outside the general scope of the contract, a close analysis of the operative *facts* of the case is required. Bromley offers no such close analysis of the facts here; rather, plaintiff merely alleges that "[t]he changes here went far beyond normal changes as contemplated in the Changes Clause." Plaintiff's Motion for Partial Summary Judgment, p. 55. Since the method of evaluating a cardinal change claim focuses on the *specific facts of the case*, and the court has been given little or no specific facts in this case, we must deny plaintiff's motion and proceed to trial where plaintiff will have the opportunity to

marshal any and all such facts of its case supporting the cardinal change claim.

Since the court finds that plaintiff has failed to meet its initial burden of demonstrating the absence of material issues of fact, we find such circumstance to be a sufficient basis to deny plaintiff's motion for partial summary judgment.

### C. *Defendant As Non–Movant Has Raised Substantial Issues of Fact*

Generally, where, as here, the moving party fails to carry its burden on the motion, the non-moving party, in such case, need not "come forward with suitable opposing affidavits." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160, 90 S.Ct. 1598, 1610, 26 L.Ed.2d 142 (1970). The consequence of such failure by the moving party is, of course, that the motion will be denied.

In the case at bar, even assuming arguendo that plaintiff had adequately met its burden, we would be constrained to find, nevertheless, that summary judgment would not lie here. This is so because defendant has met the Rule 56(f) burden of "set[ting] forth specific facts showing that there is a genuine issue for trial" in that it has raised a series of substantial and material fact issues that go to the substance of plaintiff's 14 claims, as well as to its legal theories. Given the foregoing, we shall proceed by enumerating Bromley's claims and, concomitantly, the related operative fact issues postured by defendant's submissions. Thereafter, we shall focus on the issues of fact raised by defendant that are material to plaintiff's legal theories.

### 1. Bromley's Claims
*Claim M–1—$43,460.43—Extra Winter Shut–Down*

First, plaintiff claims an entitlement to additional costs due to shut-downs of work to protect the building during the winter months in 1978 and 1979. Not only does plaintiff claim that this item was ordered and accepted as a change order by defendant, but that it was actually paid. However, upon completion of the job, defendant is alleged to have withdrawn its approval and to have taken a credit, against pay-ments then due plaintiff, with respect to said amount. Statements within the declarations of the contracting officer and the consulting engineer, submitted by defendant, contradict the plaintiff's position, *supra*, as to entitlement on this claim and raise the pertinent issue as to—whether plaintiff was *required* to shut down by either the contract or any of the 40 change orders issued by the government or whether that decision was unilaterally made by plaintiff. Defendant's App.Vol. I, pp. 32–34 and Vol. II, pp. 347–349. There is also the basic question of—whether defendant approved such payment and later paid it, after which it withdrew approval and claimed a credit against subsequent payments due plaintiff.

*Claim M–4—$6,781.04, Claim M–7—$10,-196.26, Claim M–16—$1,906.00, and Claim M–23—$11,147.33—Additional Work—South Deck*

Secondly, plaintiff seeks payment for additional work to the south deck (roof) of the building. Here again, plaintiff avers that this work was approved and paid by defendant; however, allegedly defendant later withdrew approval and took a credit against plaintiff with respect to the above amounts. Conversely, the defendant responded by categorically denying the plaintiff's contentions. The declaration of the contracting officer emphatically states that defendant never found an entitlement in favor of plaintiff to payment for any of these claims. Defendant's App.Vol. I, p. 33. The issue here, therefore, is whether the contracting officer, Olshaniwsky, in his letter to plaintiff of August 28, 1979, made an admission of entitlement in responding to plaintiff's request for payment in view of the fact that he had listed roof repairs as an "Additional Item" and indicated that a price was not settled for the item. *Id.* Moreover, a credibility issue plainly surfaces due to the contradictory testimony of Olshaniwsky in his declaration where he stated that this document did not indicate an entitlement and in his deposition (submitted by plaintiff) wherein he stated that the same letter was an indication that

Bromley was entitled to be paid for the winter shutdown. Defendant's App. I, pp. 32–34 and Plaintiff's App. II, p. 330. These contentions and credibility issues cannot be resolved on a motion for summary judgment, and, therefore, must be ventilated at trial.[5] *Firemen's Mut. Ins. Co. v. Aponaug Mfg. Co.*, 149 F.2d 359, 363 (5th Cir. 1945).

### Claim M-6—$91,345.62, M-8 $9,134.44 -Demobilization and Remobilization

Bromley contends, with respect to the above claims, that defendant caused the performance of the contract to be extended past December 31, 1978, and, consequently, agreed in advance to its liability for this delay. Defendant strenuously disputes plaintiff's allegations by arguing that the completion date of December 31, 1978, is only speculative, especially since the original contract contemplated completion within one year of the date of the notice to proceed, given on April 7, 1978, or by April 7, 1979. To support its contention, defendant points to the deposition of Mr. Beasley, the consulting engineer of WJE, which raises the fact issue—whether these costs were a direct result of plaintiff's unilateral decision to shut down for the winter months of 1978 and 1979. Defendant's App. II, p. 348. Further, the deposition of Contracting Officer Olshaniwsky also challenges plaintiff as to whether these costs were ever authorized and accepted for payment by defendant. Plaintiff's App.Vol. II, pp. 332–33. The foregoing is against the background wherein plaintiff alleges that the "additional mobilization and demobilization are extra costs which the Government agreed to absorb." See pp. 16 and 17 of Plaintiff's Motion For Partial Summary Judgment. Thus, a disputed question of fact is presented which we cannot resolve on plaintiff's motion.

5. The court is mindful that Contracting Officer Olshaniwsky is deceased but believes that other witnesses' testimony, such as his supervisor, might shed light on this issue.

6. In the Inspector General's comment on plaintiff's internal controls, he stated that they are

### Claim M-14—$196,692.06—Extra Scaffold Rental Claim

The numerous additions of work to the original contract that defendant has conceded, argues plaintiff, required the extended rental time for its scaffolding. Defendant, on the contrary, disagrees and avers that it never conceded any extras, the contract did not specify the amount of rental time required, and the cost of all scaffold rental time has been paid in the contract price and by the 40 approved change orders. More issues of fact material to plaintiff's claim for extra scaffold rental costs are raised by the Memorandum For The Record, filed by defendant, in which Contracting Officer Granata documented the meeting of the parties held July 18, 1979. Defendant's App. Vol. II, pp. 184–87. This memorandum, which documents the same meeting as plaintiff's letter of July 20, 1979, shows no agreement regarding defendant's liability for all of plaintiff's extended performance costs, including these scaffold costs. Defendant also filed an audit report, dated March 18, 1983, prepared by the Office of the Inspector General of HUD which concludes that all of the contractor's claimed extended performance costs are "unresolved," or lacking documentary support. Defendant's App. Vol. II, pp. 332–38.[6] Again, the declaration of Engineer Beasley raises the pertinent issue as to whether these costs were accounted for in the 40 change orders already paid by defendant. Defendant's App. Vol. II, p. 348. Finally, plaintiff's own submissions create a fact issue on these costs. Plaintiff has submitted "HUD's Analysis and Reply to Miscellaneous Claims [of plaintiff]" dated May 25, 1984. Plaintiff's App. Vol. II, pp. 305–310. Within this report, the issue surfaces as to whether these claimed costs were built into the unit prices calculated for extra work agreed on by the parties to serve as a basis for change orders in the meeting of April 24, 1978. This meeting

"unsatisfactory" as they relate to subject contract. Moreover, he stated that the "contractor's accounting system and records are not maintained in a manner which is readily auditable. They are not sufficiently detailed to reasonably allocate costs to individual contracts."

and agreement on costs for additional work was documented by defendant in its Memorandum for the File dated April 28, 1978. Defendant's App. Vol. I, p. 30.

### Claim M–21—$97,399.37, Claim M–22—$20,353.03—Increased Wage and Insurance Costs

Defendant agreed to pay plaintiff's increased costs of wages and insurance for the extra work during the extended performance period, contends Bromley. Additionally, according to plaintiff, these costs were not part of the unit prices established in 1978 since said increases did not occur until 1979. For its part, defendant argues that it was not informed of these increases; there was no separate agreement to pay plaintiff over and above the amount required by the contract and the approved change orders; and, consequently, it did *not* agree to pay these increases costs. Moreover, another credibility issue surrounds the entitlement of plaintiff to extra costs for wages and insurance. That is to say, conflicting evidence is presented in the form of the deposition of Contracting Officer Olshaniwsky and his declaration in which he agrees to and denies entitlement, respectively. Plaintiff's App. Vol. II, pp. 338–39 and Defendant's App. Vol. II, p. 33. Such ambiguous fact issue(s) must be resolved at trial.

### Claim M–26—$9,894.57—Extra Electrical Work

The government ordered, approved, and paid Bromley in the form of a progress payment for this extra electrical work only to withdraw said approval and take a credit against plaintiff, Bromley argues. However, the government recounts that it never paid Bromley for this work and, in fact, only used this item to calculate the amount of an "overpayment" to plaintiff. Since plaintiff has never been paid for this item, maintains defendant, it did not at any time withdraw approval and take a credit against Bromley. With respect to this item, the same credibility fact issue is present as mentioned above regarding plaintiff's claim for increased wage and insurance costs. In his declaration, Ol-

shaniwsky stated that his previously mentioned letter of August 28, 1979, responded to plaintiff's request for payment, wherein he listed electrical work as an "Additional Item," and was not an admission of entitlement. Defendant's App. Vol. I, p. 33. Nevertheless, in his deposition, Olshaniwsky stated that this letter indicated an entitlement for these costs. Plaintiff's App. Vol. II, p. 331. Again, we must resolve these credibility and factual issues at trial.

### Claim M–28—$267,155.68—Change No. 4 Repairs to No. 5 Repairs

Next, plaintiff claims an additional entitlement to costs that are retroactive to the commencement of contract performance as a result of the agreed redesignation of certain No. 4 brick repairs (involving a larger surface area) to No. 5 brick repairs (involving a smaller surface area) which required a higher unit price. Plaintiff alleges that the government unilaterally changed the contract requirement regarding No. 4 brick replacement, and Bromley agreed to this change, on the basis that it (plaintiff) would be compensated at the No. 5 repair rate for work involving less than 131 bricks. Defendant agrees that plaintiff consented to this change, but maintains that the payment rate change would be only prospective. Here, defendant's submission of the Memorandum for the Record documenting the parties' meeting of July 18, 1979 shows that these costs were to be increased prospectively only, from the date of the meeting, July 18, 1979, to the end of the contract performance. Likewise, the engineer's (*i.e.*, Beasley's) declaration indicates that this change was to be prospective. Defendant's App. Vol. II, pp. 186 and 349. Thus, an issue of fact material to this claim appears and must also be resolved at trial.

### Claim M–29—$343,140.00—Inspection and Exploration Costs

Plaintiff seeks the costs of inspections and explorations of the building during contract performance. As before, plaintiff contends that defendant agreed, in advance of performance, on the rate to be paid and

that it would pay for inspection procedures on this job. Defendant answers this allegation by denying any such agreement and by contending that plaintiff *has been paid* for all non-routine inspections under the 40 change orders issued. In support of its position, defendant's submission of Engineer Beasley's declaration raises the issue by his assertions as to—whether plaintiff has been previously compensated for these costs in the amounts paid by defendant to plaintiff under the 40 change orders previously issued. Defendant's App. Vol. II, p. 348. The fact dispute regarding the alleged agreement must, therefore, await resolution at trial.

*Claim M–30—$340,636.13—Extended Overhead Costs*

Finally, Bromley asserts an entitlement to reimbursement of *all* the costs of its extended performance based on the alleged pre-performance agreement by defendant to do so. Bromley points to its previously discussed letter to defendant dated July 20, 1979 wherein plaintiff claims to have documented this "agreement." In response, defendant counters that no separate agreement regarding all Bromley's overhead costs ever existed for the reason that these overhead costs were built into the unit prices as shown on the Cost Proposal schedule for Additional Work. Defendant's App. Vol. II, pp. 190–91. Further, defendant's submission of the Memorandum for the Record dated July 18, 1979 documenting the same meeting of the parties, as plaintiff's letter of July 20, 1979, records no such agreement. *Id.* at pp. 184–87. Therefore, we again find that a sharp material factual issue exists as to the efficacy of the so-called "agreement."

2. Bromley's Legal Theories

Not only does defendant's opposition provide creditable evidence that generates significant fact issues as to the substance of plaintiff's claims, it also raises issues of fact regarding each of plaintiff's legal bases of recovery. First, defendant challenges the *existence* of any agreement on its part to pay plaintiff's extended performance costs. The Memorandum For The Record

prepared by defendant to document the parties' meeting of July 18, 1979 reflects no such agreement, despite the contention of plaintiff that in the context of this meeting the payment agreement was made. Second, defendant states that 40 change orders were issued by HUD to pay Bromley for the approved extra work on the contract; therefore, Bromley cannot prove the element of damages necessary to recover under the Differing Site Conditions Clause. Third, defendant raises the fact issue, as supported by the record, that Bromley was aware that extra work would be performed under this contract and that plaintiff calculated its unit prices to allow for this extra work. Thus defendant's specifications were not defective, the contentions go, since plaintiff had knowledge of the existence of additional work requirements.

Defendant also points to fact issues underlying plaintiff's claim as to the government's alleged superior knowledge regarding differing site conditions. Defendant states that plaintiff could have reasonably been expected to obtain information regarding the site on its own through its own inspection and thus does not meet this element for recovery under its defective specifications claim. Moreover, plaintiff's own letter of July 20, 1979 undercuts the superior knowledge argument in that Bromley admits in this letter that all parties understood that none of them "could have been aware of the added requirements that were necessary...." Fourth, defendant opposes Bromley's cardinal change claim and points to the contract wherein plaintiff contracted to repair and renovate a building, and to the completed project, to show that plaintiff did *no more* than what it contracted to do initially. This claim is fact intensive and the material issue of whether work was performed that was without the scope of the contract must be proved at trial. Finally, defendant also raises issues of material fact regarding plaintiff's claim under the Suspension of Work Clause. The issue surfaces when defendant points to no change order authorizing plaintiff to shut down either for the winter of 1978 or

1979. Further, defendant points to the 40 approved change orders under which plaintiff was paid for extra work and raises the fact issue as to—whether, indeed, any changes in the specifications caused unreimbursed losses or expense to plaintiff. Thus, against this background, and for all of the reasons previously expressed, we find that defendant has amply met its burden on the record as a whole by raising genuine issues of fact material to both the claims themselves as well as to the legal theories on which plaintiff bases its entitlement.

*Conclusion*

For the reasons stated above, we deny plaintiff's motion for partial summary judgment in its entirety. Regarding the jurisdictional issue raised by the claims for overhead expense and interest on loans, *supra,* in that it appears that they were not presented to the contracting officer for decision, the court hereby orders the parties to brief this issue. The plaintiff shall have 20 days from the date of this opinion, *i.e.,* to July 11, 1988, to file its memorandum; defendant shall have 14 days from receipt of plaintiff's submission, *i.e.,* to July 25, 1988, to file its response; and plaintiff shall have seven days, *i.e.,* to August 1, 1988, in which to file its reply. These pleadings shall be transmitted to the court and opposing counsel via over-night mail or courier service.

Finally, on or before July 20, 1988, the parties shall file a joint memorandum with the court stipulating to a reasonable period of discovery. Additionally, the stipulation shall delineate the pretrial submission dates by each party, the date of the pretrial conference, and finally the trial date and location thereof. If said stipulation is deemed reasonable, it will be so approved.

IT IS SO ORDERED.