## PLANTATION LANDING RESORT, INC., Plaintiff,

v.

## The UNITED STATES, Defendant.

### No. 91–1474 L.

United States Court of Federal Claims.

Nov. 19, 1993.

Lawrence D. Wiedemann, New Orleans, LA, for plaintiff.

Thomas L. Halkowski, Washington, DC, for defendant.

### ORDER

MOODY R. TIDWELL, III, Judge:

This case is before the court on cross-motions for summary judgment. For the reasons set forth below, the court grants defendant's motion and denies plaintiff's cross-motion for summary judgment.

### FACTS

In October 1984, Preston Mauboulez, a land developer in the state of Louisiana; J. Folse Roy, a real estate consultant in that state; and the Jefferson Guaranty Bank formed a joint venture partnership for the purpose of owning and developing Plantation Landing, a 220 acre tourist destination resort on Grand Isle, Louisiana, about forty-eight miles south of New Orleans. In November 1985, the Bank, on behalf of the joint venture, filed an application with the New Orleans District of the U.S. Army Corps of Engineers (the Corps) requesting a permit [1]

---

1. Section 404 of the Clean Water Act (CWA) authorizes the U.S. Army Corps of Engineers to issue permits, after notice and opportunity for public hearings, for the discharge of dredged or fill material into navigable waters. 33 U.S.C. § 1344 (1988); *see also* Section 10 of the Rivers and Harbors Act, 33 U.S.C. § 403 (1988). U.S. Army Corps of Engineers regulations implementing the CWA define "navigable waters" as "those waters of the United States that are subject to the ebb and flow of the tide shoreward to the mean high water mark, and/or are presently used, or

to dredge and fill the 220 acre site in preparation for development. Plaintiff alleged that Preston Mauboulez, or the corporations over which he had control,[2] held property interests in 132 acres of the site, and J. Folse Roy and the Jefferson Guaranty Bank owned the remaining eighty-eight acres.

The Corps gave notice of the project to the public on December 18, 1985 and the town of Grand Isle conducted a public hearing on January 14, 1986. The consensus of the general public supported the project. A revised public notice dated July 24, 1986 called for protests to the proposed work, suggestions for modifications, or objections to be filed with the Corps by August 13, 1986. Plaintiff, Plantation Landing Resorts, Inc., was formed in August 1986.[3]

In a letter dated February 6, 1987, Louisiana senators and members of congress requested that the Corps give every possible consideration to pursuing a revised environmental assessment for the project rather than an environmental impact statement (EIS),[4] thereby facilitating the permit process for plaintiff.

At a meeting held on April 1, 1987, plaintiff alleged that its representatives and those of the Corps agreed that, in return for a reduction of the project size from 220 acres to 59 acres, which would eliminate the requirement for an EIS, the Corps would expedite the approval of the permit. An EIS would cost plaintiff about $200,000 and precipitate a two year delay in the project.

In a letter dated October 16, 1987, the Corps advised plaintiff that, as a result of a telephone conversation on July 27, 1987 and a meeting on August 6, 1987 conducted between their respective representatives, the Corps expected to receive a revised permit application. The Corps explained that because a revised application was not filed and because plaintiff made no progress on the project, the Corps decided to return the original permit application. With a cover letter, also dated October 16, 1987, plaintiff's agent filed a permit application dated October 13, 1987 seeking authorization for a fifty-nine acre proposal with an estimated total project cost of $44 million. The proposal in question encompassed thirty-seven acres of shallow bay bottom[5] and twenty-two acres of saline intertidal marsh on or near the northern side of Grand Isle. The plan called for extensive dredging of canals and embayments to create a small boat harbor/marina and the raising of

have been used in the past, or may be susceptible to use to transport interstate or foreign commerce." 33 C.F.R. § 322.2(a) (1990). The term "waters of the United States" includes wetlands. 33 C.F.R. § 328.3(a)(3) (1990).

2. Plaintiff alleged that Preston Mauboulez retained power of attorney for Delco Corp.; a partnership composed of Delco Corp., Burgess McCranie and George Scariano; Bay Property Developments, Inc.; Shorelands, Inc.; and Horizon Shores, Inc.

3. Through a series of assignments and transferal of ownership in 1986, the shareholders of Horizon Shores, Inc. and Shorelands, Inc. acquired all rights, titles, interests, responsibilities and obligations of Delco Corp.; a partnership composed of Delco Corp., Burgess McCranie and George Scariano; and Bay Property Developments, Inc. See, supra note 2. Furthermore on August 14, 1986 Horizon Shores, Inc. and Shorelands, Inc. became wholly owned subsidiaries of the newly incorporated Plantation Landing Resort and the subsidiary stockholders agreed to exchange their outstanding common stock for shares in Plantation Landing Resort, Inc. However, the stock transfer did not take place until July 1992.

4. The National Environmental Policy Act of 1969, as amended, 42 U.S.C. §§ 4321 et seq. requires that an environmental impact statement (EIS) be formulated for all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C) (1988); 40 C.F.R. § 1508.11 (1990). An environmental assessment (EA) is less rigorous than an EIS and provides sufficient information on potential environmental effects of a proposed action so as to determine the requirement for either an EIS or a finding of no significant impact (FONSI). 33 C.F.R. 230.10(a) (1990).

5. Pursuant to the authority of Article IX, Section 3 of the Louisiana Constitution of 1974, owners of land contiguous to and abutting navigable waterbottoms belonging to the state have the right to reclaim or recover land lost through erosion since July 1, 1921. Permits, issued by the Louisiana Department of Natural Resources, to reclaim or recover such land are valid for a period of two years. La.Rev.Stat.Ann. §§ 41:1701, 1702 (West 1990). Plantation was issued a Coastal Use Permit on December 18, 1987.

marshlands with fill material to a height of five feet above sea level for the construction of condominiums, townhouses, a motel, restaurant, and other services and facilities. Plaintiff alleged ownership of the fifty-nine acres involved in the project but defendant disputed plaintiff's ownership of certain parcels of land that constituted a significant portion of the development site.[6]

The Corps gave notice to the public of the revised project on December 7, 1987 and later extended the date within which to file an opposition to the project from December 29, 1987 to January 8, 1988. On March 24, 1988 the Corps gave notice of a public hearing to be held on April 26, 1988 to discuss the project. Once again the public response to the proposed project was favorable.

On December 14, 1988 the New Orleans District Engineer, Colonel Lloyd K. Brown, U.S. Army Corps of Engineers, issued a draft statement of findings about plaintiff's permit application. The draft findings concluded that, after thorough analysis of the various factors, the proposed work complied with established state and local laws, regulations, and codes. Furthermore, the draft findings concluded that although adverse environmental effects had been identified that related to the proposed work, issuance of the CWA § 404 permit was consonant with national policies, statutes, and administrative directives, and that on balance, issuance of the permit was not contrary to the public interest.

The draft statement of findings required plaintiff to create five acres of saline marsh in Caminada Bay during initial infrastructure dredging and fill activities. The artificially created marshlands, vegetated with native trees and shrubs and protected from shoreline erosion by the installation of floating breakwaters, were to be part of the mitigation required for the wetlands that would be lost as a result of the development.[7] The installation of two thirty-six-inch-diameter water control structures were proposed as further mitigation. Furthermore, according to plaintiff, the conditions required for the Coastal Use Permit issued by the Louisiana Department of Natural Resources, namely the construction of a sewerage treatment facility for the development, constituted additional mitigation.

Copies of the Corps' draft statement of findings and a letter indicating its intent to issue the permit were sent to the United States Environmental Protection Agency (EPA); the U.S. Fish and Wildlife Service, Department of the Interior; and the National Marine Fisheries Service, Department of Commerce.

On January 13, 1989 the Acting Assistant Administrator of EPA's Office of Water wrote to the Assistant Secretary of the Army (Civil Works) and requested review of the New Orleans District Engineer's draft statement of findings in favor of issuing the permit to plaintiff. The Assistant Secretary agreed to policy level review by the Office of the Chief Engineer and so advised EPA on February 3, 1989. On April 21, 1989 Brigadier General Patrick J. Kelly, the Director of Civil Works, U.S. Army Corps of Engineers in Washington, advised the New Orleans District Engineer of the Assistant Secretary's decision, directed the Corps to re-evaluate the application for permit by plaintiff, and provided additional guidance as to the interpretation and implementation of the Section 404(b)(1) guidelines.

On January 4, 1990, following re-evaluation of the permit application in accordance with the April 21, 1989 guidelines, the Corps advised plaintiff that the mitigative measures required as special conditions for permit issuance were altered to require creation of twenty-two acres, instead of the original five acres, of saline marsh in Caminada Bay prior to initial infrastructure dredge and fill activi-

6. Defendant contended that plaintiff failed to provide proof of ownership of lots 40 and 41 and lot V2 of subdivision No. 15. The disputed parcels of land, together, comprised a key and central portion of the development site. Plaintiff provided evidence of options to purchase certain parcels of land but defendant alleged that both options expired according to the terms of the respective contracts before plaintiff submitted the permit application.

7. Mitigation is a requirement of the CWA to offset wetland losses. 33 U.S.C. § 1344(b) (1988); 33 C.F.R. §§ 325.4(a)(1), 325.4(a)(3) (1990).

ties. Unsatisfied with the new conditions, plaintiff responded on March 6, 1990 with a counter-offer to acquire twenty-two acres of previously removed freshwater wetlands in south Louisiana (150 miles north west of Grand Isle and the development site at issue) and convert them to their former wetlands status.

At a meeting on May 16, 1990 the subsequent New Orleans District Engineer and agents for plaintiff discussed the latter's mitigation proposal and the relationship between acreage requirements for dissimilar wetlands mitigation. Plaintiff alleged that the new District Engineer agreed to issue the Section 404 permit subject to confirmation of the number of acres required for such compensatory mitigation. Plaintiff further alleged that its agents agreed to supply any number of acres that the Corps determined to be adequate wetlands mitigation.

On June 19, 1990 the Corps advised plaintiff by letter that, contrary to the information given at the May 16, 1990 meeting, some reasonable connection must be maintained between estuarine values and functions lost by the proposed infrastructure development and the wetlands offered as compensatory mitigation. In the letter, the Corps also suggested some alternative sites within the Barataria Basin that would have been considered appropriate compensation and proposed methods by which to achieve the mitigation. In addition, the Corps advised plaintiff that their Louisiana Coastal Use Permit had expired.

When plaintiff failed to respond by September 12, 1990, the Corps sent a letter advising plaintiff that, absent a reply within 14 days, the Corps would act on plaintiff's permit application. In a letter dated September 25, 1990, plaintiff responded that the "time ha[d] come to draw a line in the sand." Plaintiff asserted that any decision by the U.S. Army Corps of Engineers to deny the permit constituted an inverse condemnation by the government and that the Corps' untimely delay in considering the permit, thereby denying plaintiff all use of its property during that time, constituted a "temporary" taking. After detailing their dissatisfaction with the mitigation requirements, plaintiff sought issuance of a permit unrestricted except for the mitigative factors "encompassed in the proposed project itself."

The New Orleans District Engineer notified plaintiff by letter dated December 21, 1990, that, pursuant to 40 C.F.R. § 230.10, he was required to deny the permit application "because we are unable to agree on adequate mitigation to fully compensate for the values and functions of those special aquatic sites which would be adversely affected by [plaintiff's] proposed project." Furthermore, the District Engineer advised that even if the parties reached agreement on appropriate mitigation, the expiration of plaintiff's Louisiana State Coastal Use Permit prevented issuance of a Department of Army permit.

Plaintiff filed in this court on September 27, 1991, alleging that the action by the Corps in refusing to issue the permit deprived plaintiff of the use of its property and constituted a governmental taking under the Fifth Amendment to the Constitution of the United States.

## DISCUSSION

Summary judgment under RCFC 56(c) is properly granted when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A material fact is a fact which makes some difference in the outcome of a case. *Curtis v. United States,* 144 Ct.Cl. 194, 168 F.Supp. 213, 216 (1958), *cert. denied,* 361 U.S. 843, 80 S.Ct. 94, 4 L.Ed.2d 81 (1959). Plaintiff must, in response to a motion for summary judgment, make a showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The non-movant's burden to set forth "specific facts which generate the issue for trial" is not met by "reliance on its pleading alone, or by conclusory allegations and generalities." *Bromley Contracting Co. v. United States,* 15 Cl.Ct. 100, 105 (1988). *See also Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 1562–3, (Fed.Cir.

1987); *Campbell v. United States,* 2 Cl.Ct. 247, 249 (1983). A complete failure of proof of an essential element of the non-moving party's case necessarily renders all other facts immaterial. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552.

Furthermore, the court must be satisfied that no genuine issues of material fact are present even if the parties file cross-motions. *Tabb Lakes, Inc. v. United States,* 26 Cl.Ct. 1334, 1344 (1992); *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1391 (Fed. Cir.1987). In resolving cross-motions for summary judgment, the court cannot weigh the evidence and determine the truth of the matter. *Tabb Lakes,* 26 Cl.Ct. at 1344; *Anderson,* 477 U.S. at 249, 255, 106 S.Ct. at 2510, 2513. In considering a motion for summary judgment, the evidence must be viewed and inferences drawn in a light most favorable to the non-moving party, and any doubt must be resolved against the moving party. *Litton Indus. Prod. Inc. v. Solid State Sys. Corp.,* 755 F.2d 158, 163 (Fed.Cir.1985); *see also Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *D.L. Auld Co. v. Chroma Graphics Corp.,* 714 F.2d 1144, 1146 (Fed.Cir.1983). The court may deny summary judgment, however, if "there is reason to believe that the better course would be to proceed to trial." *Tabb Lakes,* 26 Cl.Ct. at 1344; *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513.

Before a party can recover just compensation under the Fifth Amendment for a taking, under either a physical invasion or regulatory taking theory, it must establish a compensable property interest. *Lucas v. South Carolina Coastal Council,* — U.S. —, — — —, 112 S.Ct. 2886, 2899–900, 120 L.Ed.2d 798 (1992). "In an action under the Fifth Amendment based upon the alleged taking by the United States, through inverse condemnation, it is clear that only the owner of the property at the time of the taking is entitled to be compensated for the taking." *Lacey v. United States,* 595 F.2d 614, 619, 219 Ct.Cl. 551 (1979).

In the instant case, the primary basis of defendant's motion for summary judgment was plaintiff's lack of compensable property interest. Defendant asserted that plaintiff did not have a compensable interest in the fifty and one-half acres of land (of the total fifty-nine acre project) which lay below the mean high water mark and that plaintiff failed to pursue its claim of ownership of that land.[8] Discussion of this assertion is therefore bifurcated in order to accommodate the distinction between that portion of land above the MHW mark and the area below it.

When enacting the CWA Congress intended it to have broad application: "The objective of this chapter is to restore and maintain the chemical and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a) (1976).[9] Congress expressly stated its intent "that the term 'navigable-waters' be given the broadest possible constitutional interpretation...." *Avoyelles Sportsmen's League, Inc. v. Marsh,* 715 F.2d 897, 914 (5th Cir. 1983); *see also Leslie Salt Co. v. Froehlke,* 578 F.2d 742, 754–55 (9th Cir.1978) which held that "navigable waters" within the meaning of CWA to be given "broadest possible interpretation under Commerce Clause." In accordance with the Corps regulations interpreting and implementing the CWA the key feature in determining the extent of "navigable waters," for non-inland waterways at least, is the MHW mark.[10] 33 C.F.R. § 322.2(a) (1990); *see also Leslie Salt Co.,* 578 F.2d at 753, explaining that "navigable waters ... extend to all places covered by

---

8. In 1993 a government-arranged elevation survey of the property involved in plaintiff's proposed fifty-nine acre development project resulted in a finding that 7.97 acres of that area lay above the mean high water (MHW) mark. The MHW mark for Grand Isle, Louisiana is 0.94 above the National Geodetic Vertical Datum (NGVD) of 1929. Also, the survey found that another 0.44 acres were isolated areas lying below MHW. Therefore, the survey concluded that approximately 50.59 acres lay contiguously below the MHW mark.

9. The CWA was originally called the Federal Water Pollution Control Act. *See* S.Conf.Rep. No. 1236, 92 Cong., 2d Sess. 99 (1972), U.S. Code Cong. & Admin. News 1972, p. 3668. In 1977, Congress approved the shortened title of "Clean Water Act." H.Conf.Rep. No. 830, 95th Cong. 1st Sess. 1 (1977), U.S. Code Cong. & Admin. News 1977, p. 4326.

10. *See, supra* note 1.

the ebb and flow of the tide to the mean high water (MHW) mark ..." (*cited in Owen v. United States*, 851 F.2d 1404, 1409 (Fed.Cir. 1988) (*en banc*)).

Plaintiff's project included approximately fifty and one-half acres of land measured by elevation survey to lie below the MHW mark. By definition this acreage is clearly navigable waters of the United States and subject to such state and federal regulation as might apply. The Louisiana civil code establishes state ownership of land lying below navigable water. La.Civ.Code Ann., art. 450 (West 1980) ("[p]ublic things that belong to the state are ... waters and bottoms of natural navigable water bodies ..."). However, the value of riparian ownership and the problems of tidal influx and land erosion in the Mississippi delta region are adequately accounted for in the Louisiana Constitution, which permits "reclamation by the riparian owner to recover land lost through erosion". La. Const. of 1974, art. 9, § 3. Louisiana's statutes establish the administrative procedure to be followed by riparian land owners seeking to reclaim lands "lost through erosion by action of this navigable water body occurring on and after July 1, 1921 ..." La.Rev.Stat. Ann. §§ 41:1702 B (West 1990). Such administrative procedure requires the application for a coastal use permit from the Louisiana Department of Natural Resources.[11]

By previously applying for the appropriate coastal use permit, plaintiff was aware of the statutory requirements of § 1702 of the Louisiana Code. Later, after the statutory expiration of the coastal use permit and despite the Corps's notice that the permit expired, plaintiff did not pursue a renewal of the state permit. At the time plaintiff alleged the taking occurred, it did not hold a valid permit to reclaim the submerged land required for the development project. Absent a coastal use permit, plaintiff could not reclaim the submerged land. By not renewing the permit, plaintiff extinguished its compensable

interest in the 50.59 acres of land below the MHW mark, subject to state reclamation regulation. Without such interest, plaintiff cannot proceed with a takings claim as to this land.

Furthermore, defendant asserted, and the court agrees, that plaintiff failed to provide any evidence of ownership over specific tracts of land, i.e., lot V2 of subdivision No. 15, as well as lots 40 and 41, which are central to the Plantation project. Each of the three lots is partially submerged with approximately 50% of the land above the MHW mark.

■ In its reply and cross-motion, plaintiff's "proof" of ownership of those lots of land consisted of nothing more than assertions of ownership in an affidavit and copies of purchase options taken out for the original Plantation development project in October 1984. Mere conclusory statements and denials do not take on dignity by placing them in affidavit form. *Sweats Fashions, Inc.*, 833 F.2d at 1564; *see also Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.*, 731 F.2d 831, 836 (Fed.Cir.1984). Notwithstanding that the purchase options provided by plaintiff failed to apply to lots 40 or 41 and perhaps lot V2 of subdivision No. 15, both options to purchase the property described therein expired in accordance with the terms of the agreement.[12] Accordingly, because plaintiff failed to establish proof of ownership of at least two lots of land central to its development plan, namely lots 40 and 41, plaintiff is not entitled to be compensated for a taking under the Fifth Amendment with respect to those lots.

■ In response to a motion for summary judgment, plaintiff must make a showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91

---

11. *See, supra* note 5.

12. "This option is to be for a period of one year from the date of the signing of this contract, or ninety days after a permit is obtained from the Louisiana Coastal Zone Management, and any other regulatory bodies or agencies that are nec-

essary, whichever occurs first." (Agreement Part V, Plaintiff's Appendix 337–45). Both agreements are dated October 5, 1984. Therefore the option expired prior to the date of the alleged taking, December 21, 1990, when the permit was denied.

L.Ed.2d 265 (1986). Failure of proof of an essential element of plaintiff's case necessarily renders all other facts immaterial and thereby entitles defendant to summary judgment. *Id.,* at 323, 106 S.Ct. at 2552. The second part of the analysis, addressing that portion of land above the MHW mark, encompasses defendant's alternative basis for summary judgment, namely, assuming *arguendo* that plaintiff established a compensatory interest in the fifty-nine acre site, plaintiff's claim did not withstand analysis under the factors set forth by the Supreme Court for takings claims. Justice Holmes established in *Pennsylvania Coal v. Mahon* that "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922). To determine whether the government regulation had "gone too far" in the instant case, both defendant and plaintiff rely on the three factors enunciated in *Connolly v. Pension Benefit Guar. Corp.,* namely, economic impact, investment backed expectations, and the character of the government action. *Connolly v. Pension Benefit Guar. Corp.,* 475 U.S. 211, 224–25, 106 S.Ct. 1018, 1025–26, 89 L.Ed.2d 166 (1986).

Given the facts of this case, it is not necessary to discuss each of the *Connolly* factors in detail. In *Lucas* the Supreme Court described two discrete categories of regulatory action which would be considered compensable without "case-specific inquiry into the public interest advanced in support of the restraint." *Lucas,* —— U.S. at ——, 112 S.Ct. at 2893. The first category includes "regulations that compel the property owner to suffer a physical 'invasion' of his property." *Id.* The instant case does not come within this category. Clearly, plaintiff has not been forced to suffer any physical "invasion" of its property.

The second type of regulatory action described in *Lucas* requiring categorical treatment is that which "denies all economically beneficial or productive use of land." *Id.* (citing *Agins v. Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980)). In *Lucas,* the restrictive regulation that effected the taking barred plaintiff from building any permanent habitable structure on its coastal property. *Lucas,* —— U.S. at ——, 112 S.Ct. at 2889. Regardless of any compensatory action that plaintiff in *Lucas* may have proposed, it could not circumvent the regulation and it was "flatly prohibited" from making any occupiable improvements to its land. *Id.*

The regulatory action in *Lucas* is therefore distinguished from that in the instant case because here the regulation did not "flatly prohibit" plaintiff from developing the land, nor did the regulation deny plaintiff all "economically beneficial or productive use" of the land. The Corps' denial of the CWA § 404 permit for plaintiff was premised on the failure to reach agreement on mitigation requirements. The *need* to mitigate was not at issue. Central to the instant takings claim was the failure to reach agreement on the *amount* of mitigation required "to fully compensate for the values and functions of those special aquatic sites which would be adversely affected" by plaintiff's proposal. As such, neither the regulation nor the Corps's actions denied plaintiff of all economically beneficial or productive use of its land.

Furthermore, in June 1990, the Corps provided plaintiff with several mitigation alternatives to "restore and/or create wetlands" which were considered "appropriate compensation" and offered suggestions as to how these could be achieved. While not unsympathetic to the frustrations of plaintiff, this court cannot find that the regulatory action denied all economically beneficial or productive use of the land. This is especially so where, as here, the government assisted plaintiff in the regulatory process by providing alternative solutions that would advance that plaintiff's proposals for productive use of its land.

## CONCLUSION

Accordingly, based on the foregoing, plaintiff's cross-motion for summary judgment is denied and defendant's motion for summary judgment is granted. The complaint is dismissed. No costs.

IT IS SO ORDERED.